[Crim. No. 5197. In Bank. Aug. 10, 1951.]

THE PEOPLE, Respondent, v. FELIX CHAVEZ, Appellant.

Ralph W. Rutledge and Richard E. Patton for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier and Wallace G. Colthurst, Deputy Attorneys General, and Daniel E. Weyand, District Attorney (Colusa), for Respondent.

EDMONDS, J.—Felix Chavez has been convicted of the murder of Constance (Connie) Navarro and sentenced to death. His appeal from the judgment and from the order denying a new trial presents only the question as to whether the homicide was a murder of the first degree.

The record shows testimony which may be summarized as follows:

Connie owned a bar and café in Colusa, known as the Michoacan, where she employed Gloria Uribe. Chavez, a Mexican citizen, came to Colusa from a neighboring ranch around 6 p.m. He called at the Michoacan to see Connie, whom he had known for some time. Not finding her, he then visited numerous bars and intermittently returned to the Michoacan looking for Connie. When he came back about 3:30 a. m., Connie, Gloria, and Gloria's friend Shorty were preparing to leave.

Chavez asked Connie to drive him to the ranch where he worked. She refused to do so. Connie, Gloria and Shorty then closed the bar and proceeded to the house where Connie and Gloria roomed.

This house, which was about a block and a half away, had a double entrance door which opened into the front room. There was a window on each side of the door. The remainder of the one-floor building was divided into smaller rooms, with a hall extending through the middle of the building.

On the rear of the building there was one door, and a window. One room was occupied by Connie as a bedroom and another by Gloria. A yard in the rear of the house could be entered from the alley by a gate.

Gloria, Shorty and Connie approached the house through the alley. Connie entered the rear door of the house; Gloria and Shorty followed her. The lights were on in the yard and a rear room of the house. Gloria turned on the light in her room after she locked the back door.

Connie went to her room. Gloria and Shorty entered Gloria's room. Gloria remained about five or ten minutes and then left to get a glass of water. She did not see anyone else in the house at that time.

When she returned to her room Shorty, who was drunk, was asleep on her bed. Shortly thereafter, she heard footsteps in the hall and someone turned off a light. Gloria thought she heard Connie gasp. She called out to Connie, but received no answer.

She still heard voices and then a noise like the bedsprings moving. She then started to Connie's room to see who was there. When she came into the hall, she saw that the closet lights were on as well as those in a rear room.

The door to Connie's room was wide open. Connie was lying in bed on her back, clad in a half slip and brassiere. Chavez was on top of Connie, facing her and holding Connie's hands and wrists. He had a knee on each side of Connie. He was wearing all of his clothes with the exception of his shoes.

Gloria asked Chavez what he was doing there and how he had come in, as she had locked the door. At first he did not answer and then said, "I am not doing nothing to her." He added that he had come in through the window. Connie said, "Take him off me," "He has a knife in his hands." Gloria grabbed Chavez by the shoulder. The blade of the knife was open and she struggled with him for possession of it.

Connie, meanwhile, jumped from the bed and put on her shoes. She grabbed for the knife and cut herself. She told Chavez and he said he did not intend to do it. However, neither of the women could secure the knife and Chavez refused to give

it to them. He then pushed Gloria to the wall in the hall, closed the knife and put it in his pocket.

Connie started to walk into the next room where her clothes were. Chavez was behind her and Gloria was standing by the door. When Connie started to put on her skirt, Chavez seized her by the shoulder and said something that Gloria could not hear. Connie replied, "Let me go. Why don't you go? You've done enough."

Chavez did not reply but stood there. Connie pushed him aside and said, "Let me go." She had her skirt around her neck at this time. Going to the window in the front room, she looked out, turned and pulled on her skirt.

Chavez put his hand in his right trouser-pocket, took out his knife, opened it and stabbed Connie in the left side near the abdomen. When he first struck her she said, "Please don't kill me, Felix." As Gloria ran from the room she heard Connie repeat the statement.

Gloria found Shorty asleep on her bed. The light in the yard was out and the door locked. By way of the alley she went to the sheriff's office and reported that a man was trying to kill Connie. When she returned with an officer, they came through the back door and went directly to the front room, where they found Connie lying on the floor in front of the double doors to the house. Her dress was partly down around her arms and her skirt was pulled up. On the floor next to the body was a wallet belonging to Chavez.

A physician arrived while Connie's body was comparatively warm. He testified that she had been recently assaulted and was dead. An autopsy showed multiple stab wounds involving the lower extremities, the upper extremities, the back, part of the face, and the chest wall. Death resulted from massive hemorrhage caused by a knife wound which reached the heart.

Three days later Chavez was apprehended by Stockton police. He was then carrying a spring knife with a corrugated black bone handle and a single blade which was operated by pressing a button. The knife blade was 2½ to 3 inches long. His clothes were not bloodstained. When the officers attempted to book Chavez at the jail he fought with them.

By other evidence, statements said to have been made by Chavez were presented to the jury. The record includes testimony that while the sheriff of Colusa County and two deputies took Chavez to Colusa in an automobile, John Chavez and the appellant had a conversation in Spanish. No promises

of immunity or threats of any kind were made to the appellant and he admitted that he killed Connie with the knife which the Stockton police took from him. In relating the events of the evening of the killing, he stated he was looking for Connie. She had promised him that some day she would go to his camp but she did not do so. He was angry and went to her house, intending to kill anybody that he found with Connie and then kill himself.

The appellant then told John Chavez that he hid in the alley and saw Gloria and a man go into Connie's house. He walked up to the back door, and found that it was locked. He then unscrewed the light bulb from the socket by the door, tore the screen from a window, which had a pane of glass missing, and entered the house through the window. After he was in the house, he took off his shoes and walked along the hall slowly with his open knife in his hand, intending to kill anybody he found with Connie, and "to get" Connie.

He found Connie's room and saw her lying in bed. She was asleep. She awakened and said, "Felix, you scare me." He pushed Connie back on the bed and had intercourse with her, still holding the open knife in his hand.

When Gloria walked in and asked him what he was doing there, the two women wrestled with the appellant for possession of the knife, but did not succeed in getting it. He put it in his pocket and followed Connie into the next room. Connie asked him how he got into the house. He told her that he had entered through a window. She walked to the front room and looked through the window to see if the screen was torn. She said, "Don't be a fool you fool. Get out. Stay out of here." Felix became infuriated, opened his knife and stabbed her. She fell and "he got right on top of her again, and finished doing the job that he started."

In a conversation with Mary Allread, a police matron who also acted as a Mexican interpreter, the appellant was asked certain questions. No promises of immunity or threats were made to him. In answer to these questions, Chavez stated that he entered Connie's house through the window with the intention of killing her, because she wanted to leave him for other men and he was the laughingstock of Colusa. He had a knife in his hand when he entered her room and still had it in his hand when he had intercourse with her. After the difference between rape and voluntary intercourse was explained to him, Chavez said that he raped her.

At the trial, the appellant took the stand in his own defense. He told the jury that every eight or twelve days, for some months before the homicide, Connie had visited him at the various ranches where he worked. However, prior to the night he killed her, he had not seen her for approximately three or four weeks except at her bar.

On the various occasions when she visited him, which were usually at night, she would stay for a couple of hours and they would go to bed. He asked Connie to leave her husband and join him, but she refused as her husband was ill. He gave her about $375 because he cared for her.

Continuing his testimony, Chavez said that when he approached Connie's house, he saw Gloria closing the door, and heard someone's voice. He found the back door locked, cut the screen, and entered through the window. He stated that he entered secretly because he did not want Gloria to know of his presence, believing her to be ignorant of his affair with Connie. He removed his shoes and left them as he entered the hall.

Chavez told the jury that he found Connie asleep in bed, clad in a slip. When she awakened, he was on the floor, kneeling beside her with the knife in his hand, the blade being open because it was stuck. He told her not to be afraid, got up from the floor, and sat on her bed. He kissed her and she started leaning back, "sort of offering her [self]" to him. Chavez attempted to hide the knife from her, but she saw it and tried to take it from him.

Connie told him to go, testified Chavez, and asked how he had entered the house. He told her that he had come in through the door.

Chavez denied that he had sexual intercourse with Connie or that he was on top of her holding her arms when Gloria entered the room. However, he admitted that while struggling with Connie for possession of the knife, Gloria entered the room and asked, "Who is that?" Connie replied, " 'It is Felix,' " and Gloria said, "What's the idea of bringing out a knife." The two girls then tried to take the knife from him, and in the course of the struggle Connie received a cut on her hand. He then closed the knife and put it in his pocket. Connie went into a small room across the hall where she cleaned her hand with a piece of cloth. He then told Connie, "Honey, come to me." She replied, "Please don't you ever call me 'Honey' again," and he said, "Well, but we have been honeys."

According to the testimony of Chavez, Connie said to Gloria, "Let's see which way this man came in." Connie went into the front room and looked out of the window. He followed her "with intentions of preventing her of going out to call the police." He was standing about 4 feet behind Connie and Gloria was approximately 2 or 3 yards behind him. Connie then asked, "Why are you following me?" "[T]hen I say," Chavez testified, "'I am not following you.' But my intentions were not to let her out because I thought she was going out." Connie then turned to him and said, "Well, I already told you. I am used to this—to go around with men in Colusa."

This statement, testified Chavez, made him mad and "Then that's when I hit her." He stabbed her in the abdomen and Connie "mentioned the Virgin Mary." Chavez did not remember how many times he stabbed her before she fell to the floor, but stated that, as she tried to fight back with her fists and to grab the knife, he stabbed her near the face, below the face and in the body. As she fell to the floor, Chavez dropped his knife. Connie cried out, "You already kill me." In concluding his story, Chavez said, "Then I picked [up] the knife this time, then I finished it." He did not remember how often he struck her with the knife while she was lying on the floor. Connie repeated, "You already kill me." After he finished stabbing her, he left by the door. He knew she was dying when he left her because he "heard that she was breathing very slowly." He had not spoken during the killing, and heard nothing except Connie's plea to the Virgin Mary and her cry, "You already kill me."

Chavez testified that, earlier in the week, he had purchased the knife with which he killed Connie. He also said that, a few days before the homicide, he tried to buy a pistol. When he left Connie's house, he intended to go to Mexico. He knew that he had killed Connie, and it was wrong. "That's why I was trying to get away," he explained.

Jose Arriola, a witness for Chavez, testified that he was working with him on Buffum's ranch at the time Connie was killed. Connie had been out to the ranch several times to visit Chavez, the first time being about six months before the homicide. She usually came every week or 10 days in the evenings, driving a gray car. Arriola said he was present when Connie and Chavez went into the appellant's room. The last time she came to the ranch she promised Chavez to come and see him again but told him that he was not to talk to

her in town. The witness could not remember any specific dates when Connie was present at the ranch.

Chavez does not question the sufficiency of the evidence to support the verdict. He admits having committed the homicide but contends that, under proper instructions, the jury would not have convicted him of murder of the first degree.

 After giving the statutory definitions of murder and malice, the court instructed the jury as follows:

"There need be, however, no considerable space of time devoted to the deliberation or between the formation of the intent to kill and the act of killing. It is only necessary that the act of killing be preceded by, and be the result of a concurrence of will, deliberation, and premeditation on the part of the slayer to constitute murder in the first degree, regardless of how rapidly or slowly these mental processes succeed each other or how quickly or tardily they are followed by the act of killing."[1]

This instruction, contends Chavez, "destroyed the logical distinction between first and second degree murder provided for by statute." More specifically, he complains of the sentence reading, "There need be, however, no considerable space of time devoted to the deliberation or between the formation of the intent to kill and the act of killing." It was error, he argues, to give this instruction and to refuse the one submitted by him which omits the quoted sentence and defines

---

[1] The court also gave the following additional instruction on premeditation and deliberation:

"Murder which is perpetrated by any kind of wilful, deliberate and premeditated killing is murder of the first degree.

"To constitute this type of crime, the killing must be accompanied and must be preceded by a clear, deliberate intent to take life, and intent to kill which must be the result of deliberation and premeditation so that it must have been formed upon a pre-existing reflection and not under a sudden heat of 'passion or other condition such as precludes the idea of deliberation.

"Murder is classified into two degrees, and if you should find the defendant guilty of murder, it will be your duty to determine the degree of the offense, whether first or second.

"All murder which is perpetrated by any kind of wilful, deliberate, and premeditated killing is murder of the first degree. To constitute this kind and degree of homicide the killing must be accompanied by a clear, deliberate intent to take life. The intent to kill must be the result of deliberation and must have been formed upon a pre-existing reflection and not under heat of passion or other condition such as precludes the idea of deliberation.

"The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated.

"deliberate" and "premeditate" in accordance with the definitions given in *People* v. *Bender,* 27 Cal.2d 164, 183 [163 P.2d 8].

The instruction here challenged was held to be erroneous in *People* v. *Carmen,* 36 Cal.2d 768 [228 P.2d 281]. But, conceding that it should not have been given, the mandate of section 4½ of article VI of the Constitution must be considered in determining whether the error prejudiced the rights of the appellant.

Chavez's defense was that, as he killed Connie in a "heat of passion," the crime was only manslaughter. Consistently with his testimony that he entered the house with no felonious intent, did not commit an act of rape upon Connie, but killed her only because he was infuriated by her remark, "Well, I already told you. I am used to this—to go around with men in Colusa," Chavez requested and the court gave complete instructions on the issue of manslaughter. The phrase "heat of passion" was clearly defined in accordance with the principles stated in *People* v. *Valentine,* 28 Cal.2d 121 [169 P.2d 1], and *People* v. *Wells,* 10 Cal.2d 610 [76 P.2d 493]. The differences between manslaughter and murder in both degrees were stated. The importance of the element of malice was explained. Adequate provocation and its relation to the term "heat of passion" was discussed at length and both terms were correctly defined. In accordance with *People* v. *Valentine, supra,* the jury was instructed that the existence of

---

The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decide to commit the unlawful act causing death.

"If you find that the killing was not deliberate and premeditated, or if you entertain a reasonable doubt whether the killing was deliberate and premeditated, then in such case you cannot find the defendant guilty of murder in the first degree.

"When upon the trial of a charge of murder, the jury is convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, but has a reasonable doubt whether such murder was of the first or of the second degree, the jury must give to such defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree.

"Before you may return a verdict in this case, you must agree unanimously not only as to the innocence or guilt of the defendant, but also, if you should find him guilty, as to the degree of his offense."

provocation which is not sufficient to reduce the offense to manslaughter may nevertheless raise a reasonable doubt as to the commission of murder in the first degree. Moreover, the jury was clearly and emphatically told that any doubt as to the degree of the crime must be resolved in favor of Chavez.

In short, the jury was given complete and explicit instructions concerning the particular issue presented by the testimony of Chavez that the homicide was committed in a heat of passion provoked by Connie's remark. Under these circumstances, and considering the entire record in accordance with the constitutional mandate, it cannot be said that the erroneous use of the word "considerable" in the general instruction on premeditation justifies a reversal of the judgment.

■ Also challenged is the instruction which states that in two classes of homicide the Legislature "has taken upon itself the responsibility of saying that they shall be deemed and held to be murders in the first degree." The court declared that where the killing is perpetrated by certain means, or in the perpetration or attempt to perpetrate one of enumerated felonies, "the question 'Is the killing wilful, deliberate, and premeditated?'" is answered by the statute itself, and the jury has no option but to find the prisoner guilty of murder of the first degree."

Such an instruction has been held to be an incorrect statement of the law. "In such a case the question which the statute (Pen. Code, § 189) answers affirmatively is not, 'Is the killing wilful, deliberate and premeditated?'; it is, 'Is the killing murder of the first degree?' Killings by the means or on the occasions under discussion are murders of the first degree because of the substantive statutory definition of the crime." (*People* v. *Bernard,* 28 Cal.2d 207, 211, 212 [169 P.2d 636]; *People* v. *Valentine, supra,* at pp. 135, 136.)

However, it is not shown how the instruction, although erroneous, prejudiced Chavez. In neither the Bernard nor the Valentine case was the error said to have been prejudicial. Here, the argument merely is that it tended to confuse the jury, but, considering the entire record, there is no reasonable basis for that conclusion.

■ Chavez also complains of an instruction defining "malice" in the terms of section 7 of the Penal Code. That definition, said the court in *People* v. *Waysman,* 1 Cal.App. 246, 248 [81 P. 1087], is not "appropriate in a case of this kind, and would be better omitted altogether." However, it was held that there was no prejudice because "malice" as an

element of the crime of murder also was defined for the jury in the language of section 188 of the Penal Code. The present record shows that both of these instructions were given and, for the reasons stated in affirming the Waysman conviction, Chavez was not prejudiced.

■ In connection with the instructions on murder in the attempt to perpetrate burglary or rape and in the perpetration of burglary or rape, the prosecution requested an instruction defining an attempt to commit a crime. It was not given, although the court did define rape and burglary. Chavez assigns this omission as error, contending that it was necessary for the court, on its own motion, to define an attempt. But with complete inconsistency, he also argues that because, under any view of the evidence, the homicide was not committed in the attempt to perpetrate a felony, no instruction on attempt should have been given.

Chavez correctly states that the evidence does not show a homicide in the attempt to commit a felony. If his testimony concerning the killing is accepted as true, he neither committed nor attempted to commit any felony. According to his story, he entered the house with no felonious intent, and did not attempt to have, nor did he have, sexual intercourse with Connie.

The prosecution, on the other hand, showed that Chavez broke into and entered the house with the intent to kill anyone that he found with Connie and "to get" Connie. Gloria testified that she was present at the time Chavez was "on top of Connie" who was lying in bed, clad in a half slip and brassiere. At that time, Chavez had an open knife in his hand, which he later used to kill Connie. The record also includes testimony concerning conversations with Chavez during which he admitted that when he entered the house he intended to kill Connie because she wanted to leave him, and that he raped her just prior to killing her. Whichever view of the evidence is accepted, there was no attempt to commit a felony, and no basis for an instruction defining an attempt.

■ Chavez does not specifically complain of the instruction to the jury which, in defining murder of the first degree, included one committed in an attempt to perpetrate certain felonies. If his argument is intended to charge error in so instructing the jury, it is answered by *People* v. *Chaves*, 122 Cal. 134, 141 [54 P. 596]. There, first degree murder was defined in the language of section 189 of the Penal Code. The appellant objected to the instruction as being erroneous

because there was no evidence tending to prove that the homicide occurred during the commission of or attempt to commit a felony. The court said: "This criticism has no merit, and deserves no particular notice. Obviously it was the right and duty of the court to state the law in regard to the offense, and the degrees into which it is divided as declared by the statute, and such statement did not and could not have prejudiced the defendant."

Referring to the same instructions, Chavez complains of the court's failure to define the word "perpetrate." However, as pointed out by the attorney general, the word has no technical meaning peculiar to the law. It must be assumed that the jurors, being familiar with the English language, understood the term in its usual or ordinary meaning.

Chavez also assigns as error the lack of an instruction ". . . defining 'felony', or enumerating and defining any particular felony or felonies, which would have made the act [of entering] burglary had the defendant entered with such intent." There was no evidence tending to prove that, when Chavez entered the house, he intended to commit any felony other than rape and murder. Both were defined by the court, and an instruction concerning other crimes would have had no evidentiary basis.

The absence of a definition of "felony" as used in the instruction on burglary, says Chavez, was confusing to the jurors and he points to the question addressed to the court by one of them. The record shows that, after deliberating for several hours, the jurors returned to the courtroom and one of them asked if breaking into a house without the intention of taking anything unlawfully constitutes burglary. The court answered the question by reading the statutory definition of burglary as embodied in one of the instructions. The juror then asked: "How about when a murder is committed on this burglary?" The trial judge replied: "Every person who enters any house, room . . . with intent to unlawfully steal, take and carry away the personal property of another of any value or to commit any felony, is guilty of burglary. Murder is a felony. Is that an answer to your question?" The juror said it was.

Certainly it would have been proper for the court to have stated, when giving the instruction on burglary, that rape and murder are felonies. However, it is not apparent how the failure to do so operated to the prejudice of Chavez, or

that the jury was not instructed sufficiently for a proper consideration of the issues of the case.

 The following instructions were offered by Chavez and, he contends, should have been given:

"In order to find the defendant guilty of murder in the first degree on the ground that the defendant killed the deceased in the perpetration of rape, you must find that the defendant killed the deceased while committing an act of rape upon the deceased, or that the defendant killed the deceased in pursuance of the act of rape; the killing must have been a part of the rape in an actual and material sense, and have resulted as a natural and probable consequence thereof.

"In order to find the defendant guilty of murder in the first degree on the ground that the defendant killed the deceased in the attempt to perpetrate rape, you must find that the defendant attempted to rape the deceased, and that the defendant killed the deceased while engaged in such attempt, or that the defendant killed the deceased in pursuance of such attempt; the killing must have been a part of the attempted rape in an actual and material sense, and have resulted as a natural and probable consequence thereof.

"In order to find the defendant guilty of murder in the first degree on the ground that the defendant killed the deceased in the perpetration of burglary, you must find that the defendant entered the building with the intent to commit a felony, and that in the prosecution of that purpose, and in pursuance thereof, the defendant killed the deceased; the killing must have been a part of the felony in an actual and material sense, and have resulted as a natural and probable consequence thereof."

In his argument, Chavez erroneously assumes that to bring a homicide within the terms of section 189 of the Penal Code, the killing must have occurred "while committing," "while engaged in," or "in pursuance" of the named felonies, and that the killing must have been "a part of" the felony or attempted felony "in an actual and material sense, and have resulted as a natural and probable consequence thereof."

 The law of this state has never required proof of a strict causal relationship between the felony and the homicide.

 The statute was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment, or de-

sistence of the fenoly before the homicide was completed.

In *People* v. *Boss*, 210 Cal. 245, 252, 253 [290 P. 881], this court said that the felony murder rule ". . . was adopted to make punishment of this class of crime more certain. It was not intended to relieve the wrongdoer from any probable consequences of his act by placing a limitation upon the *res gestae* which is unreasonable or unnatural." ▮ The homicide is committed in the perpetration of the felony if the killing and felony are parts of one continuous transaction. (*People* v. *Miller*, 121 Cal. 343 [53 P. 816].) Likewise, the homicide was said to be murder in the first degree when it occurred during a "continuous integrated attempt to successfully escape after the perpetration of the robberies." (*People* v. *Rye*, 33 Cal.2d 688, 693 [203 P.2d 748].) In that case the robberies took place a considerable time before the fatal beating was administered for the purpose of preventing discovery of the previously committed felony.

▮ There being no requirement that the homicide occur "while committing" or "while engaged in" the felony, or that the killing be "a part of" the felony, other than that the two acts be parts of one continuous transaction, the trial court did not err in refusing the requested instructions. (*People* v. *Covington*, 1 Cal.2d 316, 320 [34 P.2d 1019].) Furthermore, assuming that, under certain circumstances, the relationship between the felony and the homicide should be explained to the jury more explicitly than in the words of section 189 of the Penal Code, such an instruction was not here necessary. If the testimony of Chavez was believed by the jurors, they were not concerned with the felony murder rule. Only if the jurors rejected his testimony and concluded that he committed a burglary or a rape, was the relationship between the felonies and the homicide an issue for their determination. But once they decided that Chavez committed either of these felonies, the evidence required them to find him guilty of murder in the first degree. For the record shows, as a matter of law, that the homicide which immediately followed was a part of a single continuous transaction.

▮ Finally, Chavez contends that the court erred in refusing to instruct the jury that they must unanimously agree as to the theory supporting a conviction of murder in the first degree. Chiefly, he relies upon the dissenting opinion in *People* v. *Sullivan*, 173 N.Y. 122, 137 [65 N.E. 989, 93 Am. St.Rep. 579, 63 L.R.A. 353], which advances a theory rejected

by the majority of the court with the following comment: "There was but a single crime charged in the indictment against the defendant, that of murder in the first degree, and the only issue to be determined by the jury was whether the defendant had been guilty of that crime. Under our statute (section 183, Penal Code), so far as applicable to the case before us, proof either that the defendant killed the deceased with a deliberate and premeditated design to effect his death, or while the defendant was engaged in the commission of a felony or an attempt to commit a felony, though without any design to take life, established his guilt of the crime charged. 'It is not necessary that a jury, in order to find a verdict, should concur in a single view of the transaction disclosed by the evidence. If the conclusion may be justified upon either of two interpretations of the evidence, the verdict cannot be impeached by showing that a part of the jury proceeded upon one interpretation and part upon the other.' . . . So in this case it was not necessary that all the jurors should agree in the determination that there was a deliberate and premeditated design to take the life of the deceased, or in the conclusion that the defendant was at the time engaged in the commission of a felony, or an attempt to commit one; it was sufficient that each juror was convinced beyond a reasonable doubt that the defendant had committed the crime of murder in the first degree as that offense is defined by the statute."

No authority supporting the position urged by Chavez has been cited by him and the decisions follow the reasoning of the majority in the Sullivan case. (See *Candy* v. *State*, 8 Neb. 482 [1 N.W. 454]; *State* v. *Flathers*, 57 S.D. 320 [232 N.W. 51]; Wharton on Homicide [3d. ed.], § 386; 72 A.L.R. 154.) The question has not been passed upon by this court but a similar problem was presented by *People* v. *Caldwell*, 55 Cal.App.2d 238, 255, 256 [130 P.2d 495]. The defendant was charged with grand theft. Under the evidence, he might have committed larceny, embezzlement, or obtained money by false pretenses. In discussing the court's refusal to charge the jurors that they must agree upon a single theory of guilt, it was said: ". . . [T]he accusation in five counts of the information charged grand theft. Under the evidence, the jury might appropriately have concluded appellant's guilt under any one of the three above mentioned theories of grand theft as defined by section 484 of the Penal Code. . . . It was not

necessary to require the jury to agree upon the theory. If, under any one of the theories set forth, they believed appellant had gained possession of and appropriated to his own use the moneys of Pacific, he was guilty of grand theft.'' The same rule is applicable to the various grounds upon which the jury could have found Chavez guilty of murder in the first degree.

The judgment and the order denying a new trial are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Schauer, J., concurred.