Frederick L. JACKSON, Petitioner–
Appellant,

v.

George J. GIURBINO,* Warden; Cali-
fornia State Attorney General,
Respondents–Appellees.

No. 02–57117.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 2003.

Filed March 26, 2004.

---

* Petitioner is now being held at Centinela State Prison. George J. Giurbino is the Warden at Petitioner's place of confinement. Substitution from George Galaza to the proper custodian, George J. Giurbino, is authorized under Rule 43(b) of the Federal Rules of Appellate Procedure.

Laurack D. Bray, Ventura, CA, for the appellant.

Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, Scott A. Taryle, Deputy Attorney General, and Michelle J. Pirozzi, Deputy Attorney General, Los Angeles, CA, for the appellees.

Before BRIGHT,** O'SCANNLAIN, and McKEOWN, Circuit Judges.

Opinion by Judge BRIGHT; Dissent by Judge O'SCANNLAIN

BRIGHT, Circuit Judge.

A jury convicted California state prisoner Frederick L. Jackson of rape and first-degree murder with special circumstances following his trial in state superior court. Because Jackson did not personally commit the homicide in this case, his conviction depended on application of California's felony-murder doctrine. Jackson appeals from the district court's denial of his petition for the writ of habeas corpus under 28 U.S.C. § 2254, seeking to vacate his conviction and sentence of life in prison without the possibility of parole.

Jackson made many allegations of error in the state court proceedings. First, Jackson claims that the state court unreasonably admitted evidence in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("*Miranda*"). Second, he argues that the trial court improperly allowed the jury to hear unredacted excerpts of an audiotape alluding to Jackson's criminal history. Third, Jackson alleges that he received ineffective assistance of counsel in the state proceedings. Fourth, Jackson alleges prosecutorial misconduct in that the prosecutor commented on Jackson's silence in violation of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) ("*Doyle*"), and referred to him as an "animal." Finally, Jackson claims that the sum of the alleged violations amounts to cumulative error.

We do not grant relief on the basis of *Doyle* error because Jackson did not object at trial to the prosecutor's remarks. However, we agree with Jackson's claim of prejudicial *Miranda* error. Therefore, we grant his petition for the writ of habeas corpus and vacate his felony-murder conviction. After a careful review of the record, we find Jackson's other claims without merit, and dismiss them without further discussion. We leave Jackson's conviction on the rape charge undisturbed and permit

---

** The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

the state court to revoke its suspension of his sentence for that crime.

## I. Background Facts

Early Sunday morning on January 26, 1992, two fishermen found the dead body of Genoveva Gonzales in a muddy ditch near the beach in Oxnard, California. The body was uncovered below the waist. Beneath an unbuttoned denim jacket and open yellow blouse, witnesses could see Gonzales' bra pulled up over her breasts. Two bullet holes marked Gonzales' face.

Later investigation showed that Gonzales had died late Saturday night or very early Sunday morning from three[1] gunshot wounds to the head, all at point-blank range. Gonzales had a large bruise on the back of her head, which forensic doctors testified likely reflected a blow strong enough to knock her unconscious. The lack of mud on Gonzales's legs or feet led the police to believe she had been carried into the ditch.

By tracing the bullets to a gun, and the gun to its chain of owners, police identified three suspects: Bobby Rollins, Christopher Sattiewhite, and Jackson. Sattiewhite had borrowed the gun, and later bragged to friends about using it to kill a woman on the Saturday night in question. Rollins, a gang member and leading local drug dealer, made a deal to give evidence for the prosecution in exchange for major reductions in sentences he would receive for unrelated rape and armed robbery convictions.

Rollins testified that he had been present as a completely passive observer at all of the relevant events on the Saturday night of Gonzales's murder. He testified that he had seen Jackson in the back seat of a car with a woman, later identified as the victim, Genoveva Gonzales, earlier that evening. He saw Jackson "continuously" beat her with his fists, and that she spat at him and yelled at him in Spanish. Rollins also testified that he saw Jackson having sex with the woman in the back seat of the car in the parking lot of an apartment complex in the early evening. Rollins told the jury that he later happened to drive up to the road by the beach just in time to see Jackson pushing the woman out of the car into the arms of Sattiewhite, who carried her into the ditch and then shot her three times. Rollins described Jackson, Sattiewhite, and himself discussing the night's events with Lydia Sattiewhite (Rollins' girlfriend and Christopher Sattiewhite's sister) the next morning at breakfast. Rollins also testified to having later told Anna Lanier (the owner of the car Sattiewhite drove) that a crime had happened in the car.

Rollins' testimony formed the very heart of the State's case against Jackson. Other evidence offered by the State at trial included expert medical testimony indicating that Gonzales had suffered rape within twenty-four hours of her murder. The sperm found inside Gonzales matched Jackson's DNA, which tended to prove that he had had intercourse with Gonzales within three days of her death. Further evidence of rape included scratches on Gonzales' abdomen and bruises around her vagina.

However, neither the medical evidence nor testimony from any witnesses other than Rollins tended to prove that Jackson's rape of Gonzales occurred as part of a single transaction including her murder. Only Rollins testified that he saw Jackson having sex with Gonzales and that Jackson

---

**1.** Although there were only two bullet holes on the body and the police found only two shell casings at the scene, the medical examiner discovered three bullets in Gonzales' brain. The discrepancy remains unexplained. Any one of the bullets could have caused Gonzales' instant death.

and Sattiewhite were with the victim on the road by the beach.

## II. Procedural Posture

The State charged Jackson with first-degree murder, rape, and kidnaping. The jury convicted Jackson of first-degree murder, with the special circumstance of rape, on April 19, 1995. The jury also convicted Jackson of the rape charge and acquitted him of kidnaping. Because the special circumstance charge made the felony-murder a capital offense, the jury proceeded to a separate penalty phase and rejected the death penalty, returning a mandatory sentence of life in prison without the possibility of parole. Jackson appealed to the California Court of Appeal, which denied his claims. The California Supreme Court denied Jackson's petition for review on direct appeal on June 11, 1997. Jackson filed a federal petition for habeas corpus, which the district court dismissed as containing mixed exhausted and unexhausted issues. Jackson returned to the California Supreme Court to seek collateral relief on his unexhausted issues, and again that court denied Jackson's petition.

Jackson then brought a habeas petition in the United States District Court for the Central District of California on July 7, 1999. That petition was rejected as time-barred, but we reversed and remanded for consideration on the merits in an unpublished disposition. *Jackson v. Galaza,* 36 Fed. Appx. 887, 888 (9th Cir.2002). Then, Jackson's case was heard by a United States Magistrate Judge, who issued a report and recommendation denying Jackson's petition, which the district court adopted on October 22, 2002. Jackson properly obtained a certificate of appealability and timely appealed to this court. We now have jurisdiction pursuant to the provisions of 28 U.S.C. § 2253 and § 1291.

## III. Standard of Review

We review *de novo* the district court's denial of Jackson's petition for a writ of habeas corpus. *Killian v. Poole,* 282 F.3d 1204, 1207 (9th Cir.2002). By statute, we may not grant Jackson habeas relief from his state-court conviction unless the state court proceedings were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" or if the state court's conclusions were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Killian,* 282 F.3d at 1207. A state court decision is "contrary to" federal law when "the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor,* 529 U.S. 362, 406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., writing for the Court). Furthermore, "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The relevant law must have been clearly established by the time Jackson's conviction became final in the state courts. *Williams,* 529 U.S. at 390, 120 S.Ct. 1495 (Stevens, J.).

## IV. *Doyle* Violation Issues

We now consider Jackson's claim that the prosecutor impermissibly commented on his choice to remain silent in the face of police interrogation. Under the rule announced in *Doyle v. Ohio,* 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), allowing an "arrested person's silence to

be used to impeach an explanation subsequently offered at trial" is "fundamentally unfair and a deprivation of due process...."

In her closing argument to the jury, the prosecutor commented twice on Jackson's invocation of his right to remain silent. In the first instance, the prosecutor recalled a July, 1992, interview when Detective Sergeant Michael Barnes of the Ventura County Sheriff's Department talked to Jackson, Barnes' second interrogation of Jackson. The prosecutor recounted to the jury,

> [Barnes] accuses Fred Jackson of being present. [Jackson responded,] 'That's it. I don't want to say anything more.'
> *If this isn't the actions [sic] of a guilty person, then I don't know what is.* And this is something that you can consider—the way he said it, when he said it, after being confronted with the DNA analysis. You can consider this as circumstances of his guilt.

(Emphasis added). Jackson did not object.

The second prosecutorial comment on Jackson's silence came shortly after the first. The prosecutor referred to Barnes' third interview of Jackson, which took place in December, 1993,[2] explaining:

> The Sattiewhite trial is supposed to start in January of '94, and so Barnes goes one more time to talk to Fred Jackson. And he says: Listen. We've worked it out with Rollins. Rollins is going to testify against Sattiewhite and he's telling—he's going to testify to everybody's participation in this rape and murder. I thought I'd give you one more chance to talk about it.
> And what does Jackson say?

Jackson doesn't want to talk about it. He's told you enough. He says: You know I was present. You know I wasn't the shooter. And you know it wasn't planned.

Again, Jackson did not object. The trial judge, who was presiding over his first capital offense case, gave no curative instructions to the jury concerning Jackson's Fifth Amendment right not to speak to the police. Although the judge instructed the jury that it must not draw any inference from the fact that Jackson did not testify, and that Jackson's failure to testify cannot reduce the State's burden to prove every element of the crime, these instructions failed to address problems arising from the prosecution's comments regarding Jackson's silence during the police interrogation.

The California appellate court treated Jackson's argument regarding the prosecutor's improper reference to Jackson's silence as waived, because Jackson did not object before the trial court. In support of its conclusion that Jackson had waived his right to pursue the matter on appeal, the appellate court cited *California v. Mincey*, 2 Cal.4th 408, 446, 6 Cal.Rptr.2d 822, 845, 827 P.2d 388, 411 (1992) ("[The improper prosecutorial comment's] brevity and the unlikelihood of an adverse inference being drawn by the jury indicate that an objection and admonition might have cured any possible harm. Accordingly, defendant may not now raise the issue on appeal.").

 We must follow the well-settled rule that "the independent state grounds doctrine bars the federal courts from reconsidering the issue in the context of habeas corpus review as long as the state court explicitly invokes a state procedural

---

**2.** This interview occurred without *Miranda* warnings and led to Jackson's claim on that issue, which we consider below.

bar rule as a separate basis for its decision." *McKenna v. McDaniel,* 65 F.3d 1483, 1488 (9th Cir.1995). The magistrate judge refused to treat Jackson's argument on this issue as waived, however, in light of our holdings in *Bennett v. Mueller,* 296 F.3d 752, 760–61 (9th Cir.2002) and *Hill v. Roe,* 298 F.3d 796, 799 (9th Cir.2002). In *Bennett,* we determined that the state must plead the existence of an independent and adequate state procedural bar to habeas relief as an affirmative defense. 296 F.3d at 763. Now, on appeal before this court, the warden argues the *Doyle* issue on the merits, but also preserves his defense on state procedural grounds. We decline to grant Jackson relief on the *Doyle* claim because the state court's decision relies on an independent and adequate state procedural rule. Moreover, Jackson cites no case to establish that applying waiver to the alleged *Doyle* violation was contrary to clearly established federal law, as determined by the Supreme Court of the United States.

## V. *Miranda* Violation Issues

The jury heard a taped interview conducted on December 28, 1993 by Sergeant Barnes, in which Jackson admitted that he was present when Sattiewhite murdered Gonzales. Barnes interviewed Jackson twice before that third and final interview. Before the two prior interviews, Barnes advised Jackson of his rights under *Miranda,* but Barnes made no such attempt before the third interview.

The first interview does not bear on Jackson's petition. The second interview took place in July, 1992, more than one year before the important third interview. It ended when Jackson said that he did not want to speak to Barnes any more. At that time, Barnes promptly ended the discussion and left Jackson's company.

In the third interview, Barnes spoke to Jackson while Jackson remained in state custody on unrelated charges. Barnes did not advise Jackson of his *Miranda* rights prior to the interview, but rather started the interrogation by reminding Jackson that "[t]he last time I talked to you, . . . you ended the interview, and you told me, . . . I just don't want to say anything more. . . . I said okay, and I leave." Barnes then tried to persuade Jackson that in light of mounting evidence of Jackson's culpability, Jackson would fare better by telling his side of the story. Jackson acknowledged Barnes' statement noncommittally, and then Barnes asked Jackson six separate times whether Jackson would tell his story to Barnes. In utterly unambiguous language, Jackson responded to each request with a refusal to talk about the case. Finally, on his seventh try to persuade Jackson to talk, Barnes said, "Okay, alright, well you know I thought I would give it a shot." Jackson replied, "Yeah well you know I didn't do this. You know I didn't, I didn't do that. *You know I just happened to be there . . . .*" (emphasis added). After this statement, which Jackson apparently meant as an explanation for his refusal to talk, Barnes still refused to leave the interview room, asking again, "Okay. So you don't want to talk with me at all?" Jackson again stood on his right to silence, and Barnes finally concluded the interview with the words, "Alright. Thank you."

The defense objected on the grounds that Jackson's incriminating statement was derived from a *Miranda* violation. The trial judge appeared to believe that the relevant legal question centered on whether Jackson's refusal to talk at the conclusion of the second interview carried over to the third interview over one year later. At the prosecution's urging, the trial judge treated the third interview as a separate event, and considered Jackson's admission to being at the scene of the crime as a volunteered statement.

Over the defense's objections, the trial judge admitted the recording of this interview into evidence. The jury heard the entire unredacted tape, and the court also provided a transcript for the jurors to follow.

The California Court of Appeal affirmed the trial court's ruling, applying *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), to find no *Miranda* violation because Jackson volunteered the incriminating statement. The state appellate court distinguished Jackson's situation from the facts of *California v. Harris*, 211 Cal.App.3d 640, 259 Cal.Rptr. 462 (1989), where the court reversed a conviction after a police investigator "prodded" a suspect into waiving his *Miranda* rights. Unlike the police comments in *Harris*, which were designed to elicit further statements from the suspect, the state appellate court here found that "Sergeant Barnes' comment was not calculated to elicit any response at all." The court purported to apply *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), to determine that "[b]ased on the totality of the circumstances, the trial court properly found that [Jackson's] statement was volunteered."

In Jackson's habeas action, the magistrate judge found that the police conduct did violate *Miranda*, either because the context of Jackson's statement showed that it came as the result of police "hectoring" or because the interrogation was a "straightforward" violation of *Miranda* in that Barnes never read Jackson his rights before the interrogation. However, the magistrate judge determined that the error was harmless.

Even under our deferential standard of review toward the state court decisions in this case, we must conclude that the admission of Jackson's statement constitutes a patent *Miranda* violation and therefore the state appellate court's decision against Jackson directly contradicts clearly established United States Supreme Court precedent.[3] We further decide that the error was not harmless.

## A. The Custodial Interrogation

 The undisputed evidence shows that Barnes did not inform Jackson of his *Miranda* rights before commencing the crucial third interview. Jackson pointed out this fact and specifically argued for relief on that basis before the district court.

*Miranda* rights vest in the context of custodial interrogations. The warden does not dispute in this appeal that Barnes interrogated Jackson while Jackson remained in custody. *Miranda* plainly applies. *See Mathis v. United States*, 391 U.S. 1, 4–5, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) (holding that a suspect retains *Miranda* protections even when the purpose for his confinement does not relate to the case under investigation); *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (holding that an interview comes under the term "interrogation" as used in *Miranda* even when the police do not use express questioning).

The required analysis concerning the admissibility of testimonial evidence taken without *Miranda* warnings, in the absence of exigent circumstances, is refreshingly

---

**3.** While the course of our analysis leads us to conclude that the state court's decision is "objectively unreasonable," *see Miller–El v. Cockrell*, 537 U.S. at 341, 123 S.Ct. 1029 (2003), we certainly do not imply that the able and hardworking state judges in this case are unreasonable jurists. *See Williams*, 529 U.S.

at 377–78, 120 S.Ct. 1495 ("[T]he statute says nothing about 'reasonable judges,' presumably because all, or virtually all, such judges occasionally commit error; they make decisions that in retrospect may be characterized as 'unreasonable.' ").

simple. The trial court must exclude such evidence. *Miranda,* 384 U.S. at 479, 86 S.Ct. 1602 ("[U]nless and until [the *Miranda*] warnings and [the defendant's knowing and intelligent] waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [the defendant]."). This principle "go[es] to the roots of our concepts of American criminal jurisprudence[.]" *Id.* at 439, 86 S.Ct. 1602. That *Miranda* is a 'clearly established federal law' is underscored by the Supreme Court's unwavering fidelity to its basic holding. *See Dickerson v. United States,* 530 U.S. 428, 434–35, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

Here, the state courts acknowledged, and the warden concedes, that Barnes did not provide the mandatory *Miranda* warnings to Jackson.[4] Therefore, the trial court's admission of Jackson's statements made during the ensuing custodial interrogation is contrary to clearly established federal law. *Id.* at 444, 86 S.Ct. 1602 ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.").

The decisions below are contrary to federal law regarding custodial interrogation because the courts applied an incorrect legal rule for their holding. *See Williams,* 529 U.S. at 405, 120 S.Ct. 1495. The state appellate court and the federal district court erred by relying on *Mosley,* 423 U.S. at 104, 96 S.Ct. 321 for rejection of Jackson's petition. The circumstances establish that *Mosley* does not control this case, but is distinguishable because it concerned the admissibility of statements made by a suspect who received *Miranda* warnings and waived them, whereas Jackson did not receive the warnings at all during the relevant interview. *Mosley,* 423 U.S. at 97–98, 96 S.Ct. 321 (showing that the detective who obtained the incriminating statements from Mosley "carefully advised him of his '*Miranda*' rights" before the allegedly impermissible interrogation began). The state appellate court's emphasis on *Harris* is equally unavailing because, as was the case in *Mosley,* the suspect received appropriate *Miranda* warnings and waived them. 211 Cal.App.3d at 644, 259 Cal. Rptr. at 464. Nor does the "totality of circumstances" test in *Moran* apply for the same crucial distinction that *Moran* involved a defendant who was informed of his *Miranda* rights and expressly waived them. *See Moran,* 475 U.S. at 415, 106 S.Ct. 1135. Because the *Mosley, Harris,* and *Moran* courts all considered a suspect's rights to cut off questioning only after the suspect received adequate *Miranda* warnings, the subsequent "voluntariness" inquiry in those cases has no bearing where, as here, the police did not provide *Miranda* warnings before the relevant interrogation.[5] In this case, the police violated *Miranda* directly.

*Miranda* offers a "bright-line" test for the admissibility of statements made in response to police interrogation. The California Court of Appeal acted contrary to

---

**4.** Apparently, Barnes routinely declined to read *Miranda* warnings to suspects during interrogation unless he became convinced the suspect would waive the warnings and speak to Barnes. In a sworn declaration, Barnes admitted that his practice in this respect constituted a "ploy" designed to elicit a suspect's statements.

**5.** This conclusion leaves it unnecessary for us to decide whether Barnes' six rebuffed attempts to get Jackson to speak sufficed to coerce Jackson into answering the seventh attempt.

clearly established constitutional law by overlooking that bright line.

### B. No Harmless Error

■ The warden argues that even if admission of Jackson's inculpatory statement violated *Miranda*, the admission constituted harmless error because other evidence sufficed to show Jackson's guilt. We begin by confirming the standard of review: the state court's constitutional error is harmless unless the violation had a "substantial and injurious effect or influence on the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998).

■ While the State presented relatively unshakeable medical evidence that Jackson had had intercourse with the victim within three days of her death, and that the victim had probably been raped within twenty-four hours of her death, neither medical conclusion sheds any light on whether the rape took place during the course of the homicide. Rollins' testimony that he saw Jackson having sex with Gonzales earlier in the evening similarly fails to connect the rape to the murder, temporally or otherwise. Even under California's expansive felony-murder doctrine, Jackson's rape charge could serve as the underlying felony for his first-degree murder conviction only if he perpetrated the rape as part of "one continuous transaction" with Gonzales' murder at the hands of Sattiewhite. *See California v. Sakarias*, 22 Cal.4th 596, 622–24, 94 Cal.Rptr.2d 17, 34–37, 995 P.2d 152, 168–69 (2000); John S. Huster, *The California Courts Stray From the Felony in Felony Murder: What Is 'In Perpetration' of the Crime?*, 28 U.S.F.L.Rev. 739, 741 (1994). Here, there existed corroborating evidence that Jackson had raped Gonzales, but not that the rape and intercourse were part of one continuous transaction.

To convict Jackson in this case, the State needed to prove that he committed the rape as part of the same transaction that led to the murder—not that the rape caused the murder, or that the homicide occurred while the rape was in progress. *See California v. Chavez*, 37 Cal.2d 656, 669, 234 P.2d 632, 640 (1951) ("The [felony-murder rule] was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker"). *See generally* Norval Morris, *The Felon's Responsibility for the Lethal Acts of Others*, 105 U. Pa. L.Rev. 50, 69–73 (1956) (describing the contours of California's unusually broad felony-murder doctrine). Nevertheless, the State's only evidence even suggesting that Jackson committed rape as part of "one continuous transaction" with Gonzales' murder turned on a single crucial piece of evidence: that Jackson was there when Sattiewhite pulled the trigger.

Because the objective medical evidence did not suffice to pin Jackson to the scene, the State relied on testimony from Rollins, Jackson's drug dealer and sole purported witness to the full sequence of these events. Rollins testified that he saw Jackson push Gonzales out of the car into Sattiewhite's arms before Sattiewhite carried her into the ditch and shot her. However, Rollins' credibility at trial suffered to such an extent that the trial judge felt compelled to give a jury instruction regarding the weighing of evidence from an accomplice (Rollins being the only potential accomplice who had testified); the instruction emphasized the need for corroboration of accomplice testimony. Many of the criteria the trial judge told the jury it could use as factors in weighing credibility reflect against Rollins' testimony, including his status as a repeat felon and his considerable reasons to testify favorably for the State. *See generally* Hon. Stephen S. Trott, *Words of Warning for Prosecutors*

*Using Criminals as Witnesses,* 47 Hastings L.J. 1381, 1383 (1996) ("Criminals are likely to say and do almost anything to get what they want, especially when what they want is to get out of trouble with the law.").

The prosecutor, in her closing argument, invited the jury to discredit liberally any testimony from Rollins that lacked corroboration from other sources. The only other source of evidence confirming Rollins' statement that Jackson was at the scene of the crime came from Jackson himself, in his unwitting confession obtained at the unconstitutional third interview.

While we, of course, do not directly evaluate Rollins' credibility as a witness, our harmless error analysis necessarily takes into account the likelihood that the jury would have convicted Jackson without the fruit of the *Miranda* violation. We conclude that the admission of Jackson's inculpatory statement provided an inordinate boost to Rollins' otherwise minimal credibility in the jurors' minds. The prosecutor's invitation to the jury to disregard any uncorroborated testimony focused the jury's attention on Jackson's admission that he was present during the murder.[6]

Furthermore, the prosecutor expressly referred to Jackson's statements from the unconstitutional interview in the climax of her closing argument, also quoting the inculpatory passage.[7] The prosecutor also emphasized Jackson's silence from the unconstitutional third interview by inviting the jury to consider his refusal to speak to

Barnes as a sign of guilt.[8] These comments continued to draw the jury's attention to Jackson's wrongly admitted statements, exacerbating the prejudice created by their original admission into evidence. Under the circumstances, the Warden's contention of harmless error, as it relates to the *Miranda* violation, must be rejected.

## VI. Conclusion

For the reasons stated above, we grant Jackson's petition for the writ of habeas corpus. The state court proceedings were contrary to clearly established federal law because evidence was admitted against Jackson in patent violation of *Miranda v. Arizona,* and Jackson suffered substantial prejudice as a result.

We have carefully reviewed Jackson's remaining claims of *Doyle* error, other prosecutorial misconduct, ineffective assistance of counsel, and cumulative error. All of these claims lack merit in light of the deferential standard of review we employ in evaluating the lawfulness of state prisoners' detention.

We reverse the district court and unconditionally grant the writ of habeas corpus to vacate Jackson's first-degree murder conviction. The State may seek to re-try Jackson on the felony-murder charge if it acts within a reasonable time.

The state appellate court suspended Jackson's six-year sentence for rape because Jackson's sentence of life in prison

---

6. The prosecutor told the jury, "If you believe that Rollins is lying about some of the details, fine. Believe what is corroborated." The prosecutor repeated this theme several times during the closing argument.

7. The prosecutor argued at closing, "So I guess that the defense conveniently forgot about Jackson's statement when they argued to you this afternoon that there's no evidence that Fred Jackson was even there. They sim-

ply forgot about this admission by Fred Jackson. And it comes in—actually, this is—the most credible thing he's ever said was: You know I was just there."

8. The prosecutor stated, in describing Jackson's reaction to Barnes' demands for Jackson to explain himself, "And what does Jackson say? Jackson doesn't want to talk about it. He's told you enough. He says: You know I was present."

without the possibility of parole included punishment for the rape as a special circumstance of the murder. Because we have now vacated the murder conviction, the State may revoke the suspension of Jackson's independent rape sentence.

AFFIRMED in part, REVERSED in part, and REMANDED for issuance of the writ in accordance with this opinion.

O'SCANNLAIN, J., dissenting:

Because I believe that any error from the admission of Jackson's inculpatory statement was harmless, I respectfully dissent.

The jury had before it ample evidence that Jackson raped and beat Genoveva Gonzalez. Jackson's semen was incontrovertibly present in Gonzalez; the State's medical expert testified that her injuries suggested she had been raped; and Jackson's own medical expert conceded that Gonzalez's vaginal injuries were almost certainly the result of rape. He also agreed that her injuries were fresh and that Gonzalez was likely raped while she lay supine. This extensive medical evidence was entirely consistent with Rollins's testimony that he witnessed Jackson beating and then having intercourse while on top of Gonzalez a few short hours before she was murdered.[1] In view of the overwhelming forensic evidence of rape, it is difficult to see how the jury could *not* conclude that Rollins saw Jackson raping Gonzalez.

Such a conclusion, moreover, when viewed in light of California's broadly conceived doctrine of felony murder, suggests that Gonzalez's rape and murder occurred in one continuous transaction. The California Supreme Court has expressly rejected a narrow construction of the continuous transaction concept where the predicate felony is rape or robbery. *See People v. Guzman*, 45 Cal.3d 915, 929–31, 248 Cal.Rptr. 467, 479–81, 755 P.2d 917, 937–39 (1988), *overruled on other grounds by Price v. Superior Court*, 25 Cal.4th 1046, 108 Cal.Rptr.2d 409, 25 P.3d 618 (2001); *People v. Fields*, 35 Cal.3d 329, 365–69, 197 Cal.Rptr. 803, 826–29, 673 P.2d 680, 703–05 (1983). These cases have emphasized that the critical element of continuity is provided by the defendant's maintenance of control over the victim. *Fields*, 35 Cal.3d at 368, 197 Cal. Rptr. at 828, 673 P.2d at 705 ("But here the murder occurred within a few hours of the robbery, and at a site only a few miles distant, and the events are linked not only by defendant's motives but by his continued control over the victim, forcing her to remain at his house and then transporting her to the murder site."); *Guzman*, 45 Cal.3d at 951, 248 Cal.Rptr. at 489, 755 P.2d at 939 (approvingly discussing *Fields* and noting that "[t]he jury could have determined that the rape had not terminated so long as the victim had not been disposed of or confined"); *see also People v. Thompson*, 50 Cal.3d 134,

---

**1.** It bears pointing out that the overwhelming physical evidence of rape contravenes Jackson's shifting and contradictory accounts of a supposedly consensual sexual encounter with Gonzalez. These accounts were offered to the police in the two interviews before which Jackson validly waived his *Miranda* rights and were thus properly before the jury. To highlight only one inconsistency: after initially denying knowing Gonzalez at all and then admitting that he recognized her, Jackson told police in the second interview that he

and Gonzalez had had intercourse while standing up in the laundry room of an apartment complex. But as Jackson's own medical expert admitted, various abrasions on Gonzalez's body strongly suggested that she had been raped while lying on her back. Moreover, the jury heard testimony from Gary Moreno, an acquaintance of Jackson's whose apartment complex housed the laundry room where Jackson allegedly traded drugs for sex with Gonzalez, that cast serious doubt on Jackson's story.

 

171, 266 Cal.Rptr. 309, 329–30, 785 P.2d 857, 877–78 (1990) ("In this case the lewd act and the killing occurred in the same evening, probably within one or two hours. During the entire period, the victim was under the defendant's control, and for much of the time was either bound, locked in a trunk, or both.").

Given that the physical evidence supported Rollins's account of seeing Jackson beat and sexually assault Gonzalez a few hours before the murder and that Rollins later saw an apparently unconscious Gonzalez being dragged from the same Cadillac at the murder scene, the fact that Jackson exercised continuous control over Gonzalez—and that the rape had thus not terminated—is amply supported by the record.

Thus, while the majority is correct that the physical evidence of rape did not temporally link Jackson to the murder scene itself (a tall order in view of the inherent temporal imprecision of such evidence), the overall physical evidence corroborated Rollins's account of the rape and murder. I note also that the jury heard testimony from both the State's medical expert and an investigating officer that Gonzalez was most likely unconscious when she was shot—supporting Rollins's testimony that Gonzalez appeared to be unconscious when Jackson and Sattiewhite removed her from the car to murder her. In sum, the evidence supports the jury's determination that Jackson committed murder while "engaged in the commission of" rape. *See* Cal.Penal Code § 190.2(a)(17).

In view of this substantial evidence of Jackson's guilt, I cannot conclude that the erroneous admission of Jackson's statement from the third interview had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct.

1710, 123 L.Ed.2d 353 (1993) (internal quotation and citation omitted).

I would affirm the denial of the writ.