Filed 12/12/13  P. v. Zumot CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037652 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. BB943863) |
| v. | |
| BULOS ZUMOT, | |
| Defendant and Appellant. | |

Defendant Bulos Zumot was convicted, by jury trial, of first degree murder (Pen. Code, § 187, subd. (a))[1] and arson of an inhabited structure (§ 451, subd. (b)).  He was sentenced to an indeterminate term of 25 years to life for the murder, consecutive to an eight-year determinate term for the arson.

On appeal, defendant contends the trial court erred by:  (1) admitting the victim's out-of-court statements under the forfeiture by wrongdoing exception to the Confrontation Clause; (2) admitting evidence of prior acts of domestic violence under Evidence Code section 1109 and instructing the jury that it could use that evidence to infer his guilt; (3) instructing the jury on his post-crime conduct pursuant to CALCRIM No. 371; (4) giving the jury an incorrect instruction on the definition of malice;

---

[1] All further statutory references are to the Penal Code unless stated otherwise.

(5) refusing to hold a hearing after defendant claimed he was receiving ineffective assistance of counsel; (6) refusing to rule on defendant's motion for a new trial; and (7) refusing to appoint a new attorney or grant him a continuance to hire a new attorney. Finally, defendant claims the cumulative effect of the errors requires reversal. For reasons that we will explain, we will affirm the judgment.

Appellate counsel has filed a petition for writ of habeas corpus, which this court ordered considered with the appeal. We have disposed of the habeas petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).

## BACKGROUND

Defendant and his girlfriend, Jennifer Schipsi, lived together in a small house on Addison Avenue in Palo Alto. Defendant owned Da Hookah Spot, a café where people could smoke flavored tobacco from hookahs. The café was located on University Avenue in Palo Alto.

On October 15, 2009, Schipsi was strangled to death. Her body was found on a bed in the Addison Avenue house. A fire had been set in the bedroom following the strangulation, and Schipsi's body was badly burned.

At trial, the prosecution theory was that defendant killed Schipsi sometime after 1:00 p.m. on the afternoon of October 15, 2009, left the house for several hours, and returned to start the fire at about 6:30 p.m. that evening. Defendant claimed that Schipsi was alive when he left the house that afternoon and that he could not have been at the house when the fire started.

### A. *Events of October 14, 2009*

October 14, 2009 was defendant's birthday. At some point that day, defendant brought one of his two vehicles, a black Land Rover, into a vehicle repair shop owned by his friend Victor Chaalan. An insurance adjuster inspected the vehicle and recorded the mileage.

2

After a dinner party to celebrate defendant's birthday, Chaalan drove defendant and Schipsi to Da Hookah Spot. During the drive, defendant and Schipsi began arguing. Defendant became angry when he learned that Schipsi had been sending and receiving text messages from their friend Jaber Al Suwaidi.

Schipsi decided to walk home from Da Hookah Spot. At about 10:45 p.m., while walking home, she called Suwaidi. She was crying. Schipsi said there had been "a problem" and that she was "done" with her relationship; she could not "handle it anymore." Schipsi explained how defendant had gotten angry about the texts they had exchanged, and she reported that defendant had thrown her phone at her.

At 11:10 p.m., defendant sent Schipsi a text message, asking, "Where are you[?]" and telling her to "come here." He later sent her a message saying that he would see her the next day and that he was going to sleep at Chaalan's house.

At about 11:20 p.m., Nora Hanafy called Schipsi. Schipsi told Hanafy about the argument with defendant. Schipsi and Hanafy "loosely" made plans to get together after work the following day.

### B.     Events of October 15, 2009 – Early Morning

At 12:07 a.m. on October 15, 2009, Schipsi sent a text message to defendant in response to his text message about not coming home. Schipsi texted, "Good stay away from me I just got home." Defendant texted back, "I am staying away this time for good what [a] way to end my [birthday]." Schipsi and defendant then exchanged numerous additional text messages, with Schipsi telling defendant to "act like a man" and calling him, among other things, "a selfish cold hearted ungrateful human being scam artist liar."

During this exchange of text messages, Schipsi wrote that defendant owed her $10,000 for car repairs. She warned him not to threaten her again. She also wrote that defendant owed her another $1,200 and demanded he give her a check for $11,200 by the next day. She referred to defendant's unauthorized use of her credit card, saying, "pay up or I'll see you in court . . . actually[,] we have several cases that need to be resolved[.]"

3

Schipsi reiterated she wanted a check " 'for the full [$]11,200 by 11 a.m. tomorrow or I will see you in court . . . .' " She wrote, " 'I just pulled all the case numbers and will start with [the] most recent and work my way around . . . and that attorney friend of yours[,] you should kiss her ass big time because you will need a good pro bono after all of this.' " Another text message from Schipsi stated, " '[$]11,200 by 11 a.m. tomorrow[,] I've waited long enough.' " Schipsi then wrote that she knew defendant would not pay, and that she " 'know[s] what legal actions need to be taken.' "

In additional text messages, Schipsi mentioned that she would " 'obtain all legal fees' " and that she also wanted defendant to pay her for numerous items he had damaged, including a painting and furniture. Schipsi wrote, " '[Y]ou can't get away with this.' " When defendant sent a text message indicating he was coming home, Schipsi told him to leave a check under the door. She also wrote that he should meet her at the police station.

At about 2:00 a.m., defendant asked Chaalan to call Schipsi. He did, and Schipsi answered her phone. Chaalan apologized to Schipsi on defendant's behalf. Chaalan then followed defendant home. When they arrived, defendant knocked on the bedroom door and told Schipsi to come out. Schipsi refused.

Chaalan left the residence at about 2:45 a.m. Defendant soon texted him, saying, " 'we are okay.' " A video on Schipsi's phone showed her having sex with defendant at about 3:00 a.m. Defendant texted Chaalan at 3:42 a.m., saying, " 'She is cool now . . . . I love her.' "

### C. Events of October 15, 2009 – Late Morning and Afternoon

At 11:14 a.m., Schipsi sent a text message to defendant. She wrote, " '[Police] to file charges by 3 if my check is not here.' "

Shortly after noon, defendant's next-door neighbor heard a raised voice coming from defendant's house. It sounded like a young person or a woman, but the person did not sound distressed.

4

At about 12:50 p.m., Suwaidi received a text message from Schipsi stating that defendant was " 'drunk last night.' " Suwaidi responded, saying he had been trying to call defendant. Schipsi replied that defendant was probably in San Jose with his attorney.[2]

At 1:01 p.m., a text message from Paul Sandoval was received on Schipsi's phone. It read, " 'Thank you, guys for yesterday.' " A reply was sent from Schipsi's phone, stating, " 'No; thank you [. . .] We had a great time.' "

At about 1:03 p.m., defendant went to the Palo Alto Police Department to pick up a police report. At 1:09 p.m., defendant sent Schipsi a text message saying he would not be bringing her a latte.

At around 1:30 p.m., John Eckland (defendant's landlord) left his house, which was located behind defendant and Schipsi's house. Eckland noticed a white car at the end of their shared driveway. Someone was sitting in the car with a magazine, but the person was not reading. The person seemed to shield his or her face with the magazine when Eckland passed. Eckland subsequently learned that the white car belonged to the caretaker of the house across the street.

Defendant entered Da Hookah Spot at 1:37 p.m. At 1:41 p.m., defendant called Schipsi and left a voicemail message on her phone. Defendant left Da Hookah Spot at 1:45 p.m. At about 1:51 p.m., defendant purchased gasoline.

Data from cell phone towers showed defendant was somewhere near the Addison Avenue house between 2:10 p.m. and 2:26 p.m.

---

[2] Based on the writing style of these text messages, Suwaidi thought they were sent by defendant. Although Schipsi's cell phone was password-protected, there was evidence that defendant had her password: on October 6, 2013, defendant had texted Schipsi, asking why she had the phone number for someone named Bobby Dunn stored in her cell phone and stating that he had deleted the number.

Cell phone data showed that defendant was driving south on Highway 101 at 2:39 p.m. Shortly after 2:47 p.m., defendant stopped by his cousin's business in Mountain View. At 2:56 p.m., defendant called Schipsi, but the call went to voicemail.

At about 3:00 p.m., Eckland (defendant's landlord) returned to his home and checked the mail. He found a magazine that should have been delivered to Schipsi, so he rang the doorbell and knocked at the front door of the cottage, but there was no response. At that time, he also noticed a bracelet on the driveway, so he called defendant to let him know. Schipsi had worn the bracelet the night before.

At about 3:28 p.m., defendant entered the parking lot at Restaurant Depot. He left at 3:35 p.m. At 4:00 p.m., defendant attended a domestic violence class in San Jose. During class, defendant sent several text messages, including one to Schipsi at 5:25 p.m.

The instructor of the domestic violence class let the class out at about 5:45 p.m. At 5:51 p.m., defendant was still in San Jose. At 5:52 p.m., defendant made another call to Schipsi that went unanswered.

At 6:05 p.m., defendant made another call from his cell phone. The call was picked up by a cell phone tower in Mountain View, which is just south of Palo Alto.

At about 6:20 p.m. on October 15, 2009, Susie Scholpp saw defendant driving a dark sport utility vehicle down her street, which was one street over from Addison Avenue. Scholpp intentionally made eye contact with the driver because he was speeding. She was 100 percent sure it was defendant. She called the police to report the incident after seeing a photograph in the newspaper several months after the fire.

At about 6:25 p.m., Eckland left the back house to pick up his elderly father. At about the same time, Eden Salomon arrived at the back house to have dinner with Eckland. Salomon did not notice anything amiss when she passed the front residence. Eckland returned home between 6:30 p.m. and 6:35 p.m.

### D.    The Fire

At 6:39 p.m. on October 15, 2009, Daren Beaumont was driving down Addison Avenue.  He saw smoke coming from the residence and called 911.  Beaumont approached the residence and banged on the doors.  When there was no answer, he went to the back house and knocked.  Eckland and Salomon came out.  They all grabbed hoses and began spraying them inside the windows of the cottage, which had been "popping."  After about ten minutes, the flames stopped and firefighters arrived.

The first firefighting unit to arrive on the scene included Palo Alto Fire Department Captain Carter French.  Captain French entered the house and crawled into the bedroom.  He felt Schipsi's body on the bed.  He moved it about six inches but did not change its position.  The body was "[b]adly burned."  The fire, which was isolated in the one bedroom, had burned "hot and fast" without spreading, indicating the possible use of an accelerant.

Another firefighting unit was dispatched from a fire station on the Stanford University Campus.  Security camera footage from Da Hookah Spot showed that defendant was inside Da Hookah Spot when this unit went by, so the timing of that event was significant.  The unit was captained by firefighter Manuel Macias, who estimated that the truck left the Stanford station at around 6:41 or 6:42 p.m.  According to Macias, the fire truck would have passed Da Hookah Spot two to two and a half minutes later – at about 6:43 or 6:44 p.m.  However, the security camera timer (adjusted to match the time of other confirmed events) showed the fire truck did not pass Da Hookah Spot until 6:47 p.m.

Eckland called defendant to tell him about the fire at about 6:50 p.m.  At 7:10 p.m., defendant arrived back in the neighborhood near his residence.  Police officers prevented defendant from accessing the scene.  Defendant waited for a few hours and made some phone calls, including one to Schipsi.

7

Defendant also called his friend Joseph Martinez. Defendant stated that his house was on fire and he "revisited" his day, explaining that he had gone to Restaurant Depot, his domestic violence class, and Da Hookah Spot. The next day, however, defendant told Martinez that he had gone home after his domestic violence class and that he had seen Schipsi sleeping at that time.

Police questioned defendant on the night of the fire. He said he had not spoken to Schipsi that day. He had received text messages from her, but he had deleted most of them because he had " 'too many.' " Defendant denied that he and Schipsi had argued the night before, saying that they were " 'fine' " and that " 'nothing' " had happened. Defendant said that in one of Schipsi's text messages, she had threatened " 'to get even' " with him if he did not give her money.

Defendant and Schipsi's cell phones were eventually searched. Investigators found that numerous text messages had been deleted from the phones. The messages deleted from Schipsi's phone included many of the text messages she had exchanged with defendant on October 14 and 15, 2009.

### E.     Autopsy/Cause of Death

Schipsi had no soot in her lungs, indicating she had not been breathing at the time of the fire. She had no chest injuries, internal organ injuries, or head injuries. However, there were fractures to the bones and cartilage in her throat, and there was soft tissue damage in the back of her throat. The forensic pathologist believed that Schipsi's death was caused by strangulation.

Schipsi was likely unconscious at the time of the fire. A conscious person would not have been found on the mattress with one leg bent under her body and one leg extended. The position of Schipsi's body was consistent with a struggle. However, there were no visible scratches or injuries on defendant.

8

### F.    Arson Investigation

Palo Alto Police Agent Kara Salazar investigated the residence. She found no signs of forced entry. She discovered that one of the gas burners on the stove had been left on.

The fire was also investigated by Special Agent Barbara Maxwell from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). Agent Maxwell concluded that the fire had been intentionally set. There was no evidence that the fire was caused by an electrical problem. When Schipsi's body was lifted from the bed, there was a gasoline smell. In Agent Maxwell's opinion, someone had poured gasoline on the bed and lit it with a match or lighter. It would have taken "longer than a couple of minutes" for the whole room to develop into a fire. It would have taken five to 10 minutes for the windows to start breaking.

### G.    K-9 Investigation and Forensic Chemical Analysis

The ATF sent an "accelerant K-9 handler" to investigate the fire. The handler was Santa Clara County Fire Department Battalion Chief Dennis Johnsen, and the K-9 was named Rosie.

Johnsen and Rosie searched the residence the day after the fire. Rosie alerted on the living room carpet. In the bedroom, Rosie gave a very strong alert at the right rear corner of the bed and at a spot between the bed and a nightstand. Rosie also gave a strong alert at Schipsi's hair and, after Schipsi's body had been moved, at the area of the bed where her head had been.

Rosie and Johnsen searched the car defendant had been driving (a silver Land Rover), but Rosie only alerted at the vehicle's gas tank. They also searched Da Hookah Spot, where Rosie did not alert at all.

A few days later, Johnsen and Rosie were called to investigate additional items. Rosie alerted to defendant's shoes, socks, the waist area of his pants, and his sweatshirt. Rosie also alerted to the passenger side floorboard area of defendant's black Land Rover

9

and to the mat from the passenger side of that vehicle. However, no evidence indicated that the black Land Rover had left the repair shop. When the black Land Rover was inspected by the police following the fire, its mileage had not changed from the day before.

The items that Rosie had alerted to were analyzed by Katherine Hutches, a forensic chemist. Hutches used a gas chromatograph mass spectrometer (GCMS) to look for the presence of ignitable liquid. Gasoline was confirmed on the floor mat from the black Land Rover, the rug from the living room, Schipsi's hair, Schipsi's clothing, and the bedding.

The test could not confirm the presence of an ignitable liquid on defendant's sweatshirt – it found a " 'very low' " level of a potential gasoline component, but not enough for a confirmation. The test found a very small amount of acetone on the jeans. Likewise, the socks showed "a few peaks at a very low level," such that she could not confirm the presence of an ignitable liquid.

The GCMS test confirmed gasoline on both shoes, but Hutches qualified the results. She testified that "petroleum products have been known to be found in shoes," explaining that petroleum can be used in the manufacture of shoes or to clean off adhesives.

### H. Prior Domestic Violence

In 2007, Schipsi lived in San Jose near Craig Robertson. One day, Robertson saw Schipsi and defendant together in the hallway. He heard a slap, turned around, and saw Schipsi holding her face. On another occasion, while Robertson heard Schipsi's phone ring over 100 times. Schipsi said the calls were from defendant. Robertson often advised Schipsi to get a restraining order and "just to get away." Schipsi told him she was "afraid for her life."

Jacob Allen had dated Schipsi from 1998 until 2007. At some point after their break-up, Schipsi was living in downtown San Jose with defendant. One day, Schipsi

10

called Allen, "pretty frantically." Allen helped Schipsi move her belongings out of the house. Schipsi was rushing to get her belongings out before defendant returned. Allen saw that some of Schipsi's belongings were damaged. Schipsi said defendant was responsible for the damage.

Allen also spent some time with Schipsi after she obtained a restraining order against defendant. Defendant would "constantly" send text messages to Schipsi. During this time, Schipsi was scared and had become thin from not eating.

On March 17, 2008, Schipsi went to the police station to file a report. Schipsi reported that about one month earlier, she had broken up with defendant. Following the breakup, defendant had assaulted her, damaged her vehicle, and harassed her. She also reported that three days earlier, defendant had yelled obscenities at her and spit in her face. She brought emails from defendant. In one email, defendant acknowledged that he had done "the ugliest thing ever" to her but vowed to win her back "at any cost."

Schipsi's phone rang two or three times as she spoke to the officer. She told the officer it was defendant calling. The officer spoke with defendant and saw some text messages defendant had sent to Schipsi. In the text messages, defendant referred to the damage to Schipsi's car, acknowledged that he had hurt her " 'bad,' " and called her a " 'cancer.' "

In August of 2009, Heather Winters observed Schipsi with bruises on her face and arms. Schipsi initially said she had been "clumsy," but she later told Winters that defendant had hit her. Schipsi told Winters that there was a letter in a safety deposit box that would say defendant was responsible "for doing stuff to her." Schipsi also stated that defendant had threatened to kill her. In addition, defendant had mentioned a plan to burn down Da Hookah Spot for insurance money, saying he would make it look like an accident.

Palo Alto Police Agent Adrienne Moore responded to a call from Schipsi on the afternoon of August 24, 2009. Schipsi said defendant had called her and threatened her

11

life. Schipsi was particularly fearful because defendant was fascinated with forensic television shows that gave him ideas for "planning the perfect crime [and] getting away with it." Schipsi also told Agent Moore of defendant's statements about burning down Da Hookah Spot for insurance money.

While in the presence of Agent Moore, Schipsi spoke with Leslie Mills on the phone. Schipsi told Mills that defendant had threatened her. Defendant said he would kill Schipsi and burn her house down.

### I. Domestic Violence Experts

Richard Ferry, a licensed marriage and family therapist, testified as a domestic violence expert for the prosecution. He testified that many victims of domestic violence feel depressed and anxious. Victims may perceive themselves as blameworthy. They may rationalize the abuse and believe they can stop it. They may try to appease the abuser; one strategy is having sex. Victims may also provoke the violence when the build-up becomes unbearable. Recantation of domestic violence allegations is very common.

Dr. Carol Lieberman testified as an expert witness for the defense. She testified that if a domestic violence victim was trying to appease the batterer, she would not call him names and insult him. A domestic violence victim would try to appease the batterer by having sex, but would not enjoy it. A domestic violence victim would not hit the batterer, beg for him to come home, push him to get married, or try to rekindle the relationship after a long period of separation. A batterer would not call the police to report that his partner had hit him.

### J. Defendant's Testimony

Defendant claimed to be "innocent." He described his relationship with Schipsi as one that had "ups and downs."

Defendant admitted that during an argument on February 7, 2008, he had kicked Schipsi's car. However, he claimed he did it because Schipsi was going to run him over.

Defendant also acknowledged that he had gotten upset with Schipsi in March of 2008, spitting on or at her during a confrontation. Defendant claimed he was upset because Schipsi had admitted to having an affair with her boss.

After the March 2008 incident, defendant pleaded guilty to making harassing calls. He was placed on probation for three years and ordered to attend 52 domestic violence classes. Schipsi also obtained a restraining order against defendant. However, she subsequently filed a request to modify the restraining order, stating that she had fabricated the accusations against defendant.

Defendant testified that Schipsi was jealous and violent towards him. In December of 2008, he went to the police after Schipsi broke his phone, grabbed his keys, and hit him in the head. In August of 2009, Schipsi went to Da Hookah Spot, where she broke a door and took his keys.

Defendant gave his account of the birthday dinner on October 14, 2009. He admitted getting upset when Suwaidi sent a text message to Schipsi. He also admitted telling Schipsi to "shut up" during the car ride after dinner but claimed he had been joking. He explained that after he went home that night, he and Schipsi made up, smoked from a hookah, and had sex. He had used the gas stove to heat up charcoal for the hookah.

Defendant gave a detailed account of his whereabouts on October 15, 2009. He claimed that he woke up at 10:54 a.m. when the police called to let him know he could come pick up a police report. He showered and left the house at about 11:05 a.m., without hugging Schipsi. He assumed that the lack of a hug bothered her and that it was the reason she subsequently sent him a message threatening to go to the police if he did not pay her the money he owed.

Defendant claimed that he could not find parking near the police station and soon returned home. He worked out, ate some food, and tried to get the police report again at about 12:30 p.m. However, there was still no parking. He bought a latte for Schipsi and

13

brought it back to the cottage, where he found her still in bed. Defendant was impeached with the text message he had sent to Schipsi at 1:09 p.m., which said he would *not* be bringing her a latte.

At about 1 p.m., defendant returned to the police station for a third time, parking in a yellow zone. After he got the police report, he went to his office at Da Hookah Spot, then went to put gas in his car.

Defendant testified that he returned to the café at about 2:15 p.m. He then went to his cousin's warehouse, to Restaurant Depot, and to his domestic violence class. He claimed that the class did not get out until 5:55 p.m. and that he went to the restroom before leaving. He was impeached with evidence that he made phone calls beginning at 5:46 p.m.

Defendant asserted that he drove directly to the café after the domestic violence class, arriving in downtown Palo Alto at 6:32 p.m. He had to drive around for a while to find parking, however, so he did not arrive at the café until about 6:39 p.m.

Defendant claimed he had not been worried about Schipsi despite not receiving any calls or texts from her all day. Schipsi had mentioned that she was planning to visit a friend in the hospital, so he thought that might explain her lack of communication.

Defendant explained why there were no signs of forced entry at the cottage. According to defendant, Schipsi would sometimes leave the front door to the cottage unlocked for him. She would also forget to lock the side door after going outside to smoke. He did not generally lock the door behind him if Schipsi was at home when he left the house.

Defendant claimed he had planned to ask Schipsi to marry him during a trip to Palm Desert, where they planned to travel a few days after the fire. He had gotten his probation officer's permission to go on the trip.

14

Defendant denied that he owed Schipsi any money. He had borrowed some money from her a few months earlier but paid it back. At the time of the fire, he had about $87,000 in the bank.

Defendant denied much of the prior domestic violence. He denied threatening to kill Schipsi or burn down the house in August of 2009. He denied watching crime shows.

## DISCUSSION

### A.     Admission of Schipsi's Unconfronted Statements Under the Forfeiture by Wrongdoing Doctrine

Defendant contends the trial court erred by admitting Schipsi's out-of-court statements regarding his threats to kill her, burn down her house, burn down Da Hookah Spot for insurance money, and commit "the perfect crime" and "get[] away with it." The trial court admitted the statements under the forfeiture by wrongdoing doctrine, which is a recognized exception to both the hearsay rule and the Confrontation Clause. (See Evid. Code, § 1390; *Giles v. California* (2008) 554 U.S. 353 (*Giles*).)

Defendant argues that the forfeiture by wrongdoing doctrine applies only when the prior statements were made by "a witness in an ongoing proceeding who had already testified or made statements at a prior proceeding." He claims that because there was no ongoing legal proceeding at the time of Schipsi's murder, her statements were not admissible under the forfeiture by wrongdoing doctrine.

As we will explain, the forfeiture by wrongdoing doctrine applies when the defendant's wrongful act is intended to stop the victim "from reporting abuse to the authorities." (*Giles, supra,* 554 U.S. at p. 377; see also *People v. Banos* (2009) 178 Cal.App.4th 483, 502.) There is no requirement that there be a formal ongoing legal proceeding at the time of the defendant's wrongful acts. Thus, the trial court did not err by ruling that Schipsi's statements were admissible under the forfeiture by wrongdoing doctrine.

15

### 1.     Proceedings Below

In its motions in limine, the prosecution argued that the trial court should admit Schipsi's prior statements to law enforcement regarding defendant's threats and abuse. The prosecution argued that even if the statements were "testimonial," they were admissible under the Confrontation Clause pursuant to the forfeiture by wrongdoing doctrine.  (See *Giles, supra,* 554 U.S. at p. 358.)  The prosecution further argued that Schipsi's statements were admissible pursuant to Evidence Code section 1390, in which the Legislature had recently codified the forfeiture by wrongdoing doctrine.[3]

The parties discussed the issue during motions in limine, but the trial court deferred its ruling until mid-trial.   Ultimately, the trial court ruled that the statements were admissible under the forfeiture by wrongdoing doctrine.  It found "by a preponderance of the evidence that [defendant] engaged in wrongdoing that was intended to and did procure Ms. Schipsi's unavailability as a witness."

### 2.     Analysis

The forfeiture by wrongdoing doctrine is an established exception to the Sixth Amendment's requirement that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  "[T]he rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds." (*Crawford v. Washington* (2004) 541 U.S. 36, 62 (*Crawford*).)  "That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." (*Davis v. Washington* (2006) 547 U.S. 813, 833.)

In *Giles, supra,* 554 U.S. 353, the United States Supreme Court addressed the development and scope of the forfeiture by wrongdoing doctrine.  The issue in *Giles* was

---

[3] Evidence Code section 1390, subdivision (a) provides:  "Evidence of a statement is not made inadmissible by the hearsay rule if the statement is offered against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."

16

whether a statement is admissible under the forfeiture by wrongdoing doctrine any time the defendant's wrongful act leads to the witness's unavailability, or whether "the exception applie[s] only when the defendant engaged in conduct *designed* to prevent the witness from testifying." (*Id*. at p. 359.)

In *Crawford, supra,* 541 U.S. at page 54, the Supreme Court had previously held that the Confrontation Clause allows the introduction of unconfronted, testimonial statements only under "exceptions established at the time of the founding." Thus, in *Giles,* the Supreme Court "ask[ed] whether the theory of forfeiture by wrongdoing … is a founding-era exception to the confrontation right" (*Giles, supra,* 554 U.S. at p. 358) and whether, at common law, there was a "purpose requirement" (*id*. at p. 361).

The *Giles* court reviewed a number of common law cases, noting that courts had "permitted the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant. [Citations.]" (*Giles, supra,* 554 U.S. at p. 359.) Some of the common law applications of the doctrine included admission of "testimony previously given at a coroner's inquest" (*ibid*., citing *Lord Morley's Case,* 6 How. St. Tr. 769, 770-771) and "statements made at bail and committal hearings conducted under the Marian statutes." (*Giles, supra,* at p. 359.) Based on the common law cases and treatises, the court concluded that the forfeiture by wrongdoing doctrine did contain a "purpose requirement" – i.e., that its application depended on whether the defendant's wrongful act was intended to prevent the witness from testifying. (*Id*. at p. 361.) The court further noted that even American courts had never invoked the doctrine "outside the context of deliberate witness tampering." (*Id*. at p. 366.) The *Giles* majority also clarified that admission of evidence under the forfeiture by wrongdoing doctrine did not require that the prior statement have been subjected to confrontation. (*Id.* at pp. 369-370.)

The *Giles* majority explained how the forfeiture by wrongdoing doctrine might apply in a domestic violence case: "Acts of domestic violence often are intended to

17

dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution – rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify." (*Giles, supra,* 554 U.S. at p. 377.)

Defendant contends that *Giles* supports his claim that Schipsi's statements were not admissible under the forfeiture by wrongdoing exception to the Confrontation Clause. Defendant relies on the common law cases discussed in *Giles*, contending that the forfeiture by wrongdoing doctrine had only been applied "when, at the time the defendant acted, there was an ongoing legal proceeding from which the witness was actually kept from testifying."

A similar argument was rejected in *People v. Banos* (2009) 178 Cal.App.4th 483 (*Banos*). In *Banos,* the defendant was convicted of murdering his ex-girlfriend. At trial, the prosecution had introduced out-of-court statements the victim made "to police during prior domestic violence investigations." (*Id.* at p. 485.) The *Banos* court considered whether the statements had been properly admitted under the forfeiture by wrongdoing doctrine, in light of *Giles*. The court interpreted *Giles* as holding that "forfeiture by wrongdoing is implicated not only when the defendant intends to prevent a witness from testifying in court but also when the defendant's efforts were designed to dissuade the witness from cooperating with the police or other law enforcement authorities." (*Banos, supra*, 178 Cal.App.4th at p. 501.) Thus, the victim's testimonial statements were admissible because there was substantial evidence that the defendant killed her both "to stop her from reporting his assaultive behavior to the police" (*id.* at p. 502) and "to stop

18

her from testifying against him at the [pending] hearing" on his violation of a restraining order (*id.* at p. 503).

We agree with the *Banos* court that the forfeiture by wrongdoing doctrine applies when a defendant purposely kills a witness to prevent the witness from reporting the defendant's conduct to the police. In other words, the forfeiture by wrongdoing exception applies even when there is no ongoing legal proceeding. As the *Banos* court recognized, this principle is clear from *Giles*, where the majority and concurring opinions indicated that the exception would apply when the defendant's act was intended to "dissuade a victim from resorting to outside help" or "to isolate the victim and stop her from reporting abuse to the authorities." (*Giles, supra,* 554 U.S. at p. 377; see also *id.* at p. 380 [conc.opn. of Souter, J.]; *Banos, supra,* 178 Cal.App.4th at pp. 501-502.) In fact, the *Giles* majority opinion specified that "evidence of ongoing criminal proceedings at which the victim would have been expected to testify" was relevant to the defendant's intent, but not a prerequisite for application of the forfeiture by wrongdoing doctrine. (*Giles, supra,* 554 U.S. at p. 377.)[4]

In this case, the trial court found that Schipsi's statements were admissible because the prosecution made a preliminary showing that defendant killed her in order to prevent her from being available as a witness. The trial court was not required to find that there was an ongoing legal proceeding before admitting Schipsi's statements under the forfeiture by wrongdoing doctrine.

Defendant briefly asserts that "there is no evidence at all" suggesting that he killed Schipsi to stop her from filing a police report about the alleged $11,200 debt "or to stop

---

[4] Even before *Giles,* federal cases had held that the forfeiture by wrongdoing doctrine applies to acts that are intended to prevent future testimony from a "potential witness" in a possible future legal proceeding. (See *United States v. Emery* (8th Cir. 1999) 186 F.3d 921, 926 [witness was cooperating in an investigation].) Federal cases had likewise specified that the forfeiture by wrongdoing doctrine applies "to situations where 'there was [no] ongoing proceeding in which the declarant was scheduled to testify.' [Citations.]" (*United States v. Dhinsa* (2d Cir. 2001) 243 F.3d 635, 652.)

19

her from becoming a witness." Construing this as a claim that the facts did not support the trial court's finding regarding his intent, we find no abuse of discretion. (See gen., *People v. Waidla* (2000) 22 Cal.4th 690, 717 ["an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence"].) Defendant had already been convicted of harassing Schipsi and was on probation for that offense at the time of the murder. The night before her murder, Schipsi sent him numerous text messages threatening to go to the police regarding financial issues, including his unauthorized use of her credit card. On the day of her murder, Schipsi sent defendant a text message indicating that the police would "file charges" against him. In light of these facts, the trial court could reasonably find, by a preponderance of the evidence, that defendant killed Schipsi in order to prevent her from reporting him to the police or becoming a witness against him in a future legal proceeding.

In sum, we reject defendant's claim that the admission of Schipsi's out-of-court statements about his prior threats and violence violated the Confrontation Clause.

### B.      *Admission of Prior Domestic Violence and Associated Instruction*

Defendant contends the trial court erred by admitting evidence of prior acts of domestic violence under Evidence Code section 1109, arguing that the statute violates due process. He further contends the trial court erred by instructing the jury that it could use the evidence of his prior domestic violence to infer his guilt, pursuant to CALCRIM No. 852.

#### 1.      Proceedings Below

The prosecution's motions in limine included a motion to admit evidence of defendant's "prior physical assaults" on Schipsi. Defendant opposed the admission of the evidence.

As indicated above, the trial court admitted evidence of several incidents of domestic violence, including: (1) the slap witnessed by Craig Robertson in 2007; (2) the

20

assault and vehicle damage reported by Schipsi in 2008; (3) the spitting incident reported by Schipsi in 2008; (4) the bruises witnessed by Heather Winters in 2009; and (5) the threats reported by Schipsi in 2009.

Most of the prior domestic violence was admitted pursuant to Evidence Code section 1109, subdivision (a)(1), which provides in pertinent part: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

Pursuant to CALCRIM No. 852, the trial court instructed the jury on how to consider the prior domestic violence, as follows:

"The People presented evidence that the defendant committed domestic violence that was not charged in this case. 'Domestic violence' means abuse committed against an adult who's a cohabitant or former cohabitant, a person who dated or is dating the defendant, or a person who was or is engaged to the defendant.

" 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of [im]minent serious bodily injury to himself or herself or to someone else.

"The term 'cohabitants' means two unrelated persons living together for a substantial period of time resulting in some permanency of the relationship. Factors that may determine whether people are cohabiting include but are not limited to: One, sexual relations between the parties while sharing the same residence; [¶] Two, sharing of income or expenses; [¶] Three, joint use or ownership of property; [¶] Four, the parties holding themselves out as husband and wife; [¶] Five, the parties registering as domestic partners; [¶] Six, the continuity of the relationship; [¶] And seven, the length of the relationship.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged

21

domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you concluded that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely. If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence, and based on that decision, also conclude that the defendant was likely to commit and did commit murder as charged here.

"If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient, by itself, to prove that the defendant is guilty of murder. The People must still prove that charge beyond a reasonable doubt. Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility."

### 2. Admission of Evidence

Defendant contends that the admission of prior domestic violence pursuant to Evidence Code section 1109 violates due process because the admission of propensity evidence violates " 'historical practice.' "

Defendant acknowledges that the California Supreme Court addressed a similar argument when it upheld the admission of prior sex crimes pursuant to Evidence Code section 1108, in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*). He also acknowledges that several appellate courts have found the reasoning of *Falsetta* applicable to the admission of prior domestic violence pursuant to Evidence Code section 1109. (See *People v. Cabrera* (2007) 152 Cal.App.4th 695, 704 (*Cabrera*) ["Since *Falsetta* was decided, several cases from the California Courts of Appeal have applied its reasoning to reject claims that admission of prior acts of domestic violence pursuant to section 1109 violates due process."].) Nevertheless, defendant argues that the

reasoning of *Falsetta* is inapplicable to the admission of prior domestic violence pursuant to Evidence Code section 1109.  In order to address his claim, we will briefly review the due process analysis of the *Falsetta* decision.

In *Falsetta,* the court explained that a statute violates due process if it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." (*Falsetta, supra,* 21 Cal.4th at p. 913.)  The court acknowledged that "[f]rom the standpoint of historical practice, unquestionably the general rule against admitting [propensity] evidence is one of long-standing application." (*Ibid.*)  However, the court pointed out, "a long-standing practice does not necessarily reflect a *fundamental*, unalterable principle embodied in the Constitution." (*Id.* at p. 914.)  Since "the rule against admitting evidence of the defendant's other bad acts to prove his present conduct" had already been "subject to far-ranging exceptions," a new statutory exception applicable in sex offense cases did not necessarily offend fundamental historical principles.  (*Ibid.*)

The *Falsetta* court noted that, according to some authorities, courts had been "considerably more 'ambivalent' about prohibiting admission of defendants' other sex crimes in sex offense cases," and that such evidence was often admitted.  (*Falsetta, supra,* 21 Cal.4th at p. 914.)  The court thus found it "unclear whether the rule against 'propensity' evidence *in sex offense cases* should be deemed a fundamental historical principle of justice." (*Ibid.*)

Ultimately, the *Falsetta* court did not decide whether the rule against admission of propensity evidence should be "deemed fundamental from a historical perspective" in sex offense cases.  (*Falsetta, supra,* 21 Cal.4th at p. 915.)  Instead, it determined that Evidence Code section 1108 "did not unduly 'offend' those fundamental due process principles . . . in light of the substantial protections afforded to defendants" by the statute. (*Ibid.*)  The court then reviewed those protections.  First, "Evidence Code section 1108 is limited to the defendant's *sex offenses*, and it applies only when he is charged with

committing *another sex offense*." (*Id.* at p. 916.) In addition, the statute "requires *pretrial notice* of the offenses sought to be proved, assuring that the defendant will not be surprised or unprepared to rebut the proposed evidence." (*Ibid.*) Further, the admission of propensity evidence pursuant to Evidence Code section 1108 is still subject to limitation and exclusion pursuant to Evidence Code section 352, which "affords defendants a realistic safeguard" against prejudice. (*Id.* at p. 918.)

Defendant argues that admission of prior domestic violence under Evidence Code section 1109 violates due process because, unlike in sex offense cases, there is no historical "ambivalence" about admitting propensity evidence in domestic violence cases. However, as noted above, *Falsetta* did not turn on the question of whether the rule against admission of propensity evidence is "deemed fundamental from a historical perspective" in sex offense cases. (*Falsetta, supra,* 21 Cal.4th at p. 915.) Instead, the *Falsetta* court found no violation of due process because Evidence Code sections 352 and 1108 afforded defendants "substantial protections" (*ibid.*), which "ensured that such evidence cannot be used in cases where its probative value is substantially outweighed by the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury" (*id.* at p. 917).

Like Evidence Code section 1108, Evidence Code section 1109 affords defendants "substantial protections" that ensure the propensity evidence will not lead to a fundamentally unfair trial. (*Falsetta, supra,* 21 Cal.4th at p. 915.) Evidence Code section 1109 is limited to evidence of the defendant's prior domestic violence, and it applies only when he is charged with committing a crime involving domestic violence. (See *id.* at p. 916.) Evidence Code section 1109 is also subject to the limitations of section 352. Under the reasoning of *Falsetta,* this limitation ensures that Evidence Code section 1109 does not violate the due process clause. (See *Cabrera, supra,* 152 Cal.App.4th at pp. 703-704; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095-1096; *People v. James* (2000) 81 Cal.App.4th 1343, 1353; *People v. Brown* (2000)

77 Cal.App.4th 1324, 1335; *People v. Johnson* (2000) 77 Cal.App.4th 410, 417-420.) We therefore reject defendant's due process challenge to section 1109.

### 3. Jury Instruction

Defendant next contends the trial court erred by instructing the jury, pursuant to CALCRIM No. 852, that it could use the evidence of his prior domestic violence to infer his guilt. He claims the instruction was also flawed because it told the jury that the prior domestic violence only had to be proved by a preponderance of the evidence, thereby lowering the prosecution's burden of proof. Defendant contends that for both of these reasons, the instruction violated his federal and state due process rights.

In *People v. Reyes* (2008) 160 Cal.App.4th 246, 252 (*Reyes*), the court rejected arguments similar to those defendant makes here. The *Reyes* court first explained that the instruction does not allow a jury to find the defendant guilty based solely on disposition evidence: "CALCRIM No. 852 explains that *if* the jury finds the defendant committed the uncharged acts, it *may* but is not required to conclude the defendant was disposed to or inclined to commit domestic violence and may also conclude that the defendant was likely to commit and did commit the crimes charged in this case. . . . CALCRIM No. 852 clarifies that even if the jury concludes the defendant committed the uncharged acts, that evidence is only one factor to consider, along with all the other evidence and specifies that such evidence alone is insufficient to prove the defendant's guilt on the charged offenses. CALCRIM No. 852 then goes on to state that the People must still prove each element of every charge beyond a reasonable doubt." (*Id.* at p. 252.)

The *Reyes* court relied on the California Supreme Court's decision in *People v. Reliford* (2003) 29 Cal.4th 1007 (*Reliford*) to explain that CALCRIM No. 852 did not lighten the prosecution's burden of proof. *Reliford,* which involved an analogous instruction on the use of prior sex crimes evidence, "emphasized that nothing in the instruction at issue authorized the jury to use preponderance of the evidence as the burden of proof on any issue other than the preliminary determination whether the accused

25

committed a previous sexual assault. [Citation.] On that basis, the court rejected the notion that a jury could reasonably interpret the instruction to authorize a guilty verdict of a charged offense on the basis of a lowered standard of proof. [Citation.]" (*Reyes, supra,* 160 Cal.App.4th at p. 253.)

We agree with the *Reyes* court that CALCRIM No. 852 is constitutional. Thus, the trial court did not err in giving the instruction in this case.

## C. Instruction on Post-Crime Conduct

Defendant contends the trial court erred by instructing the jury on his post-crime conduct pursuant to CALCRIM No. 371. That instruction told the jury that if defendant attempted to hide evidence or fabricate evidence, such conduct could show consciousness of guilt. Defendant contends the instruction was not "balanced," because it only told the jury that such evidence could be used to convict him. Defendant claims that a proper instruction would have told the jury that such evidence could also be used to acquit him.

### 1. Proceedings Below

At trial, the prosecution's theory was that defendant deleted text messages from his cell phone and Schipsi's cell phone to cover up the argument they had on October 14, 2009 and to cover up Schipsi's threats to go to the police if defendant did not pay her the following morning. The defense presented evidence that defendant had not deleted all of the text messages relating to the argument and Schipsi's demands for payment.

Pursuant to CALCRIM No. 371, the jury was instructed as follows: "If the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. [¶] If the defendant tried to create false evidence or obtain false testimony, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to

26

decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

### 2. Analysis

In arguing that CALCRIM No. 371 is unbalanced, defendant relies on *Cool v. United States* (1972) 409 U.S. 100 (*Cool*). In *Cool,* the defense relied heavily on the testimony of an accomplice, who admitted his own guilt and insisted that the defendant had no culpability. The trial court told the jury that the accomplice's testimony should be viewed with suspicion, but that it could be considered if the jury was " 'convinced it is true *beyond a reasonable doubt.*' " (*Id.* at p. 102.) The trial court further instructed the jury that the accomplice's testimony, if believed, could "support your verdict of guilty . . . ." (*Id.* at p. 103, fn. 4.)

The United States Supreme Court found the accomplice instruction deficient in two respects. First, it "place[d] an improper burden on the defense" to prove that the accomplice's testimony was true beyond a reasonable doubt. (*Cool, supra,* 409 U.S. at p. 103.) Second, it was "fundamentally unfair in that it told the jury that it could convict solely on the basis of accomplice testimony without telling it that it could acquit on this basis." (*Ibid.*, fn. 4.)

Defendant asserts that CALCRIM 371 is similarly unfair, because it told the jury that certain post-crime conduct could be used to convict, but did not tell the jury that post-crime conduct could also be used to acquit. We disagree. The instruction did not inform the jury that *all* of defendant's post-crime conduct could be considered only to support a finding of guilt. The instruction referred specifically to evidence that defendant tried to hide evidence or create false evidence. Thus, the instruction did not bar the jury from considering defendant's other post-crime conduct as evidence of his innocence. Defendant remained free to argue that his failure to delete certain text messages showed that he did not have a consciousness of guilt.

27

Defendant acknowledges that the California Supreme Court has upheld instructions similar to CALCRIM No. 371. (See *People v. Famalaro* (2011) 52 Cal.4th 1, 35 [consciousness of guilt instruction did not violate federal constitutional rights to due process, a fair jury trial, nor to a reliable jury determination of guilt]; *People v. Jurado* (2006) 38 Cal.4th 72, 125 [consciousness of guilt instructions were not impermissibly argumentative, did not permit the jury to draw irrational inferences, and were not potentially misleading].) As defendant points out, these cases did not consider the precise argument that defendant makes here. Nevertheless, as explained above, defendant's contention is without merit, because the instruction did not preclude the jury from considering all of defendant's post-crime conduct as evidence of his innocence. The instruction merely told the jury that if defendant tried to hide evidence or create false evidence, such conduct could be used as evidence of his guilt. The instruction did not bar the jury from considering defendant's other post-crime conduct as evidence he was innocent.

### D.    *Instructions on Malice*

Defendant contends the trial court erred by giving the jury a definition of malice that does not apply to homicide cases. He acknowledges that the jury *was* given a proper definition of malice in conjunction with the homicide instructions, and that the second definition of malice was properly given in conjunction with the arson instruction. Nevertheless, he claims the trial court erred because it "did not specifically tell the jury what malice definitions applied to what crimes."

#### 1.    Proceedings Below

The trial court instructed the jury on murder pursuant to CALCRIM No. 520 as follows:

"The defendant is charged in count 1 with murder, in violation of Penal Code section 187. To prove that the defendant is guilty of this crime, the People must prove

28

that one, the defendant committed an act that caused the death of another person; and two, when the defendant acted, he had a state of mind called malice aforethought.

"There are two kinds of malice aforethought:  Express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

*"The defendant acted with express malice if he unlawfully intended to kill.*

*"The defendant acted with implied malice if, one, he intentionally committed an act; two, the natural and probable consequences of the act were dangerous to human life; three, at the time he acted, he knew his act was dangerous to human life; and four, he deliberately acted with conscious disregard for human life.*

"Malice aforethought does not require hatred or ill-will towards the victim.  It is a mental state that must be formed before the act that caused death is committed.  It does not require deliberation or the passage of any particular period of time. . . ."  (Emphasis added.)

The trial court then gave instructions that explained the difference between first-degree murder and second-degree murder.  It gave instructions explaining how the jury should consider the two degrees of homicide and fill out the verdict forms for count 1.  It then gave an instruction about the expert testimony concerning "Intimate Partner Battering" and an instruction about the evidence of uncharged domestic violence.

The next instruction given was CALCRIM No. 1502, which defined arson of an inhabited structure.  As given, the instruction stated:

"The defendant is charged in count 2 with arson that burned an inhabited structure, in violation of Penal Code section 451(b).  To prove that the defendant is guilty of this crime, the People must prove that:  One, the defendant set fire to or burned a structure;

"Two, he acted willfully and maliciously;

"And three, the fire burned an inhabited structure.

" 'To set fire to or burn' means to damage or destroy with fire either all or part of something no matter how small the part.  Someone who commits an act willfully when he

29

or she does it willingly or on purpose. *Someone acts maliciously when he or she intentionally does a wrongful act, or when he or she acts with the unlawful intent to defraud, annoy, or injure someone else.*

"A structure is any building. A structure is inhabited if someone lives there and either is present or has left but intends to return.

" 'Property' means personal property or land other than forest land." (Emphasis added.)

### 2. Analysis

Defendant contends the instructions allowed the jury to convict him based on a legally incorrect theory – i.e., that he was guilty of murder based on a finding that he acted "maliciously," as defined by the arson instruction. He contends that reversal is required because there is no basis in the record to find that the jury's murder verdict was actually based on a valid definition of malice. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

We first note that defendant failed to request any clarification of the malice instructions below. " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Guiuan* (1998) 18 Cal.4th 558, 570.)

Even if defendant's claim is not forfeited, it lacks merit, because there is no "reasonable likelihood that the jury misconstrued or misapplied" the malice instructions. (*People v. Clair* (1992) 2 Cal.4th 629, 663 (*Clair*).) "Jury instructions must be read together and understood in context as presented to the jury. Whether a jury has been correctly instructed depends upon the entire charge of the court. [Citations.]" (*People v. Tatman* (1993) 20 Cal.App.4th 1, 10.)

Here, the instructions made it clear to the jury that the definition of "maliciously" applied only to the arson count and that the "malice aforethought" required for murder

was defined differently. As set forth above, the jury was instructed on the meaning of the term "malice aforethought" pursuant to CALCRIM No. 520, which clearly applied only to the murder count. The jury heard the definition of the term "maliciously" only within the context of the arson instruction (CALCRIM No. 1502), which was given after several intervening instructions.

The prosecutor's argument to the jury likewise made it clear that express or implied "malice" was required for murder and that the term "maliciously" applied only to the arson charge. The prosecutor told the jury that a person acts with "implied malice" if he or she does not have the intent to kill, "but the act is so dangerous in and of itself that you knew better and you did it anyway." The prosecutor told the jury that express malice was "just this: Intent to kill." He went on to argue that defendant acted with express malice because he intended to kill Schipsi, as shown by his act of strangling her, his threats, and his motive. Later, when discussing the arson count, the prosecutor told the jury that it had to find the fire was "willfully and maliciously" set – "[i]n other words, on purpose, or with the intent to defraud, annoy, or injure another's property."

In light of the fact that the murder instruction contained a correct definition of malice, the fact that the murder instruction was clearly separate from the arson instruction, and the arguments to the jury, there is no "reasonable likelihood" that any of the jurors believed that the definition of "maliciously" given with the arson instruction applied to the murder charge. (*Clair, supra,* 2 Cal.4th at p. 663.)

The cases cited by defendant are inapposite. In each case, the incorrect definition of malice was specifically given in conjunction with a murder charge, not in association with a separate offense that required the jury to find the defendant acted maliciously. (See *People v. Shade* (1986) 185 Cal.App.3d 711, 714 [defendant charged with murder only]; *People v. Price* (1965) 63 Cal.2d 370, 374 [defendant charged with murder, robbery, and auto theft]; *People v. Chavez* (1951) 37 Cal.2d 656, 666-667 [defendant charged with murder only].)

31

In sum, we find no instructional error concerning the term malice.

### E.    Sentencing Hearing

Defendant contends the trial court committed several errors at the sentencing hearing.  Defendant contends the trial court should have (1) held a *Marsden* hearing (*People v. Marsden* (1970) 2 Cal.3d 118) when he indicated he wanted to replace his retained attorneys, (2) ruled on his motion for a new trial, and (3) replaced retained counsel with appointed counsel or granted a continuance so he could retain a new attorney.

### 1.    Proceedings Below

Throughout trial, defendant was represented by retained counsel:  attorney Mark Geragos and his associates.  One of those associates, Tina Glandian, appeared at the sentencing hearing, which was held on October 28, 2011.

At the sentencing hearing, attorney Glandian informed the trial court that her firm had "been preparing post[-]trial documents, including [a] motion for new trial, as well as a sentencing memorandum."  However, defendant had instructed her firm "not to file these documents" because he wanted to substitute in another attorney.  Attorney Glandian stated, "We haven't prepared for sentencing and it's my understanding that [defendant] wants to relieve us today."

The trial court indicated it was "taking this comment as a motion to continue the sentencing to allow [defendant] to get a new attorney and possibly bring motions."  Attorney Glandian confirmed that this was "[c]orrect."  She asked that the trial court either "relieve us as counsel today" and appoint counsel,  or "put the matter over so that [defendant] can hire a new attorney and have us relieved."

The prosecution objected and requested "the sentencing go forward at this time."

The trial court noted that it had been "eight months since the verdict was rendered."  The trial court further noted that no motion for new trial was pending, because although the Geragos firm had prepared one, defendant had instructed his

attorneys not to file any post-trial documents. Speaking to defendant, the trial court stated, "There's no new attorney here to accept your representation today. Basically, all I have is a vague assertion that you want to bring [a motion for a new trial]. You want to hire a new attorney who may or may not bring such a motion." It found "that the showing of good cause [for a continuance] is not met."

The trial court then gave defendant an opportunity to speak. Defendant stated that he had fired attorney Geragos a month earlier "because of ineffective counsel." He complained that attorney Geragos had not called certain witnesses, including experts, who would have "prove[d] my innocence." Defendant asked the trial court to appoint him an attorney "to file for motion for new trial for ineffective counsel and the new evidence." He indicated he could not "afford one right now."

The trial court found that defendant's allegations of ineffective assistance were "vague" and "inadequate to justify further continuance." It reiterated, "It's been eight months." The trial court found that one month was "ample time to have another attorney who could have appeared today on your behalf." The trial court noted that defendant needed "the Court's permission in order to get rid of an attorney if" relieving counsel would leave him unrepresented. It found that defendant was making his request "for purposes of delay" and reiterated that his request for a continuance was denied.

Defendant asserted that he would have hired a new attorney, but attorney Geragos had advised him that at sentencing, "they'll give you a new one." The trial court informed defendant that a new attorney would know that he or she would have to appear at sentencing and request to substitute in, and that the trial court could still deny that request if it would result in "inordinate delay." The trial court also noted that although defendant said he had "fired Mr. Geragos' office," attorney Glandian had not been relieved and had a continuing duty to represent him.

Defendant reiterated that attorney Geragos had advised him that "[h]e was going to appoint me [a] new attorney." The trial court reiterated that attorneys "should know

33

that if they want to be relieved as counsel or a new counsel wants to substitute in, they need to be here in front of the Court so that can happen." The trial court also stated that it would not "relieve Mr. Geragos' office and essentially leave you without a lawyer."

Defendant asked for "enough time to hire another attorney." The trial court reminded defendant that it had been eight months since the jury's verdicts and one month since he had supposedly fired attorney Geragos.

Attorney Glandian requested that counsel be appointed for defendant, asserting that her firm was "now conflicted" with defendant. The trial court found that "the assertion of ineffective assistance of counsel … doesn't mean that you have a conflict and doesn't mean that the Court has to substitute counsel. At the most, it would mean that the Public Defender could come in and tell us whether or not they think that there's been ineffective assistance," but that would occasion additional delay in the proceedings.

Attorney Glandian indicated that she understood, but she reiterated her request for appointed counsel and a "short" continuance so that sentencing could occur "when someone's here prepared to go forward and who [defendant's] cooperating with."

The prosecutor argued that the trial court had "the discretion to just deny it and move on and sentence." He argued, "[T]his is a game and it needs to end. It's been a month since he said he fired the lawyer. We've had eight months since the verdict in this case. It's time for [defendant] to be sentenced."

Attorney Glandian stated that "there was some misunderstanding on [defendant's] part for not having a new attorney." She informed the court that according to defendant, he had consulted with a new attorney and would be able to bring that person "on board," but he was "under the impression that he didn't need to have new counsel here today." She stated, "And unfortunately, we haven't directly discussed that prior to today."

The trial court denied the motion to continue and began to sentence defendant. Defendant interrupted, asserting, "I'm not going to get sentenced for a crime I did not commit, period. I am innocent and I refuse to be here. I'm not going to accept this."

Defendant accused the trial court of "favoring the DA," and he accused the prosecution of fabricating and hiding evidence "until they framed me and they put me behind bars for a crime I did not commit."

When the trial court asked attorney Glandian if there was "any legal cause for not pronouncing judgment at this time," attorney Glandian responded: "Your Honor, it is our position that there is legal cause, that the fact is that there are grounds for [a] motion for new trial that [defendant] intends to bring forth, and that we're conflicted."

The trial court asked, "Well, I take it you're not prepared to raise the issues of new trial today?" Attorney Glandian responded, "I am not." The trial court stated, "All right. Then there is no motion here that the Court can entertain either in writing or orally, and therefore, the Court will proceed to sentence the defendant."

### 2. Failure to Hold a *Marsden* Hearing

Defendant first argues that the trial court erred by failing to hold a *Marsden* hearing. He claims the trial court was required to inquire into defendant's allegation that his trial counsel was ineffective. We disagree. A *Marsden* hearing, at which the court determines whether counsel is providing ineffective assistance or whether the attorney client relationship has irremediably deteriorated, is not an appropriate vehicle for considering a defendant's complaints against retained counsel. (*People v. Hernandez* (2006) 139 Cal.App.4th 101, 108 (*Hernandez*).)

Defendant's reliance on *People v. Sanchez* (2011) 53 Cal.4th 80 (*Sanchez*), is misplaced. In *Sanchez,* the defendant was represented by appointed counsel, not retained counsel, when he alleged that he had not received effective assistance. (*Id.* at pp. 84-85.) Because defendant was represented by retained counsel, not appointed counsel, the trial court did not err by failing to hold a *Marsden* hearing. (*Hernandez, supra,* 139 Cal.App.4th at p. 108.)

### 3. Failure to Rule on Motion for New Trial

Defendant next contends he made an oral motion for a new trial and that the trial court erred by failing to address it.

Defendant relies on *People v. Braxton* (2004) 34 Cal.4th 798 (*Braxton*). In *Braxton,* the defendant was represented by counsel, who stated at sentencing that he " 'would like to make a motion for new trial' " and that he had brought juror affidavits establishing possible jury misconduct. (*Id.* at p. 806.) The trial court refused to " 'entertain any oral motion,' " ruling "that new trial motions must be submitted in writing before a sentencing hearing." (*Ibid.*) The Court of Appeal reversed, concluding "that the trial court had erred when it refused to entertain defendant's oral motion for a new trial because in criminal cases new trial motions may be made either orally or in writing . . . ." (*Id.* at p. 807, fn. omitted.) The California Supreme Court upheld this aspect of the appellate decision, while also noting that it did not "condone defense counsel's conduct in making the motion at this time and in this fashion." (*Ibid.*, fn. 2.)

*Braxton* does not help defendant, because neither defendant nor his attorney made an oral motion for a new trial. Defendant asked the trial court to appoint him an attorney "*to file* for motion for new trial for ineffective counsel and the new evidence." (Emphasis added.) Unlike in *Braxton,* defendant did not ask the trial court to *consider* a motion for a new trial. As the trial court noted below, "[T]here is no motion here that the Court can entertain either in writing or orally . . . ." As neither defendant nor his attorney brought a written or oral motion for a new trial, the trial court did not err by failing to consider such a motion.

### 4. Failure to Appoint New Counsel or Grant a Continuance

Defendant next contends the trial court erred by failing to appoint counsel for him or grant him a continuance so he could retain new counsel. He claims the record shows that attorney Glandian was unprepared for the sentencing hearing and thus, that the trial court's rulings denied him the effective assistance of counsel.

36

We first note that defendant made only a bare claim that he was indigent, so it is unclear whether he would have been entitled to appointed counsel under any circumstances. (Compare *People v. Ortiz* (1990) 51 Cal.3d 975, 979 (*Ortiz*) [defendant had failed to pay retained counsel for services rendered and was unable to pay for future services].) His claim that he could not "afford [a new attorney] right now" was contradicted by his representation that he wanted "to hire another attorney" and had already "consulted with another attorney." But even assuming that defendant made a showing of indigence, his claim fails.

In order to have the trial court appoint counsel to represent him, defendant first needed to discharge his retained attorneys. Although a criminal defendant has the right to discharge a retained attorney with or without cause, that right "is not absolute." (*Ortiz, supra,* 51 Cal.3d at p. 983.) The trial court has discretion to deny a motion to discharge retained counsel "if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]." (*Ibid.*; see also *People v. Keshishian* (2008) 162 Cal.App.4th 425, 429 (*Keshishian*).)

Here, defendant sought to discharge retained counsel on the day of sentencing, October 28, 2011. As the trial court noted, the trial had been over for more than eight months: the jury had returned its verdicts on February 10, 2011. The sentencing hearing had already been continued several times.[5] The trial had been very long, with numerous witnesses and exhibits, resulting in a record of several thousand pages. It would have taken considerable time for any attorney to become familiar with the case, and thus discharging retained counsel would have have "necessitate[d] a lengthy delay in the proceedings." (*People v. Munoz* (2006) 138 Cal.App.4th 860, 870 (*Munoz*).) Moreover,

---

[5] The sentencing hearing was initially set for April 21, 2011. For reasons not reflected in the record, it was continued to June 23, 2011 and then to September 8, 2011. Pursuant to defendant's request, sentencing was then continued to October 14, 2011. The record does not reflect the reasons for the final two-week continuance to October 28, 2011.

defendant waited until the sentencing hearing to inform the trial court about his dissatisfaction with retained counsel and request a change of attorneys, which strongly indicated that he "had an interest in delay." (*Ibid.*)

In view of all the circumstances, the trial court did not abuse its discretion by denying defendant's request to discharge retained counsel and appoint new counsel, as such discharge clearly would have resulted in " 'disruption of the orderly processes of justice.' " (*Ortiz, supra,* 51 Cal.3d at p. 983; see *Keshishian, supra,* 162 Cal.App.4th at p. 429 [no abuse of discretion to deny request to discharge retained counsel brought on the day of trial]; compare *Munoz, supra,* 138 Cal.App.4th at pp. 864, 870 [error to deny motion to discharge retained counsel where defendant made timely, repeated, and detailed requests following a two-day trial].)

The trial court also did not abuse its discretion by denying defendant's motion for a continuance to obtain new retained counsel. Such a disruption in the proceedings was not "reasonable under the circumstances." (*People v. Turner* (1992) 7 Cal.App.4th 913, 919.) The trial had ended eight months earlier, and the Geragos firm had prepared a motion for new trial and a sentencing memorandum, but defendant had instructed the firm not to file those documents. After sitting through the trial, the trial court could reasonably find that defendant was "motivated not by any genuine dissatisfaction with counsel but by a desire to delay the [sentencing]." (*Ibid.*) In addition, a number of Schipsi's family members were present at the sentencing hearing, and two (her father and her aunt) were prepared to testify about the impact of her death. The trial court could reasonably determine that in light of the timing and basis of defendant's request, a further delay of sentencing would cause an unjustified "attendant further inconvenience" to these witnesses. (*Ibid.*)

Defendant emphasizes that attorney Glandian was unprepared for the sentencing hearing. He asserts that by proceeding with the sentencing hearing with an unprepared attorney, the trial court denied him the right to the effective assistance of counsel.

38

In support of his argument, defendant cites *People v. Maddox* (1967) 67 Cal.2d 647 (*Maddox*), where the court stated that "a counsel who has been denied the opportunity to prepare is the equivalent of no counsel at all." (*Id.* at p. 652.) However, *Maddox* involved a very different situation. There, the defendant made timely pretrial requests to represent himself, and his appointed counsel made a timely motion to be relieved so that the defendant could proceed in pro per. The trial court denied each of those requests, but then did a "sudden about-face" on the day of trial, allowing him to proceed in pro per but refusing to grant him a continuance so that he could prepare. (*Id.* at p. 651.) The *Maddox* court held that the trial court erred. It rejected the People's claim that defendant's lack of preparation stemmed from his refusal to cooperate with appointed counsel, noting that "to do so would be inconsistent with our determination that he was entitled to assert his right to represent himself." (*Id.* at p. 654.) Further, there was no showing that the defendant sought a continuance for "the purpose merely of delaying the trial." (*Id.* at p. 655.)

In this case, defendant's request to relieve his retained counsel was not timely – it was not made until eight months after trial. Although defendant claimed to have fired the Geragos firm a month before the October 28, 2011 sentencing hearing, this was not reflected in the minutes of October 14, 2011, when the trial court granted a two-week continuance. Further, defendant himself was responsible for his attorney's unpreparedness at the sentencing hearing: the Geragos firm had prepared post-trial motions, but defendant had instructed her firm "not to file these documents." Defendant's refusal to cooperate with his attorneys cannot be the basis for a claim of ineffective assistance of counsel. (Cf. *People v. Roldan* (2005) 35 Cal.4th 646, 682 ["a criminal defendant cannot willfully refuse to cooperate with his appointed attorney, thereby possibly hampering his own defense, and then claim he is entitled to a new attorney because counsel has not been effective"], overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421; see also *People v. Snow* (2003) 30 Cal.4th 43, 116,

122 [if attorneys failed to present evidence or argument because they were following defendant's wishes, trial court's refusal to appoint new counsel did not deny defendant the right to effective assistance of counsel].) Finally, unlike in *Maddox*, the record suggests that defendant's request to relieve his retained counsel – without naming a new attorney or having a new attorney present at the sentencing hearing – was made for purposes of delay. Under the circumstances, the record does not support defendant's claim that the trial court denied him the effective assistance of counsel by failing to appoint new counsel or grant a continuance so he could retain new counsel.

### F.    *Cumulative Error*

Defendant contends that even if each of the asserted errors is harmless when considered independently, the cumulative impact of the asserted errors requires reversal. (See *People v. Hill* (1998) 17 Cal.4th 800, 844.) Inasmuch as we have not found any errors, we reject defendant's claim of cumulative error.

## DISPOSITION

The judgment is affirmed.


_____
BAMATTRE-MANOUKIAN, J.


WE CONCUR:


_____
ELIA, ACTING P.J.


_____
MÁRQUEZ, J.